**Karen Hodo DONNEL, Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 99–1018T.

United States Court of Federal Claims.

Sept. 18, 2001.

Susan Lindley, Boulder, Colorado, attorney of record for plaintiff. Ron S. Jong, Boulder, Colorado, of counsel.

Robert J. Higgins, Washington, D.C., with whom was Acting Assistant Attorney General Claire Fallon, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

This opinion addresses Karen Hodo Donnel's ("plaintiff" or "Ms. Donnel") December 29, 1999 claim for refund of $69,305 in Federal Insurance Contributions Act ("FICA") taxes she paid, and comes after a trial that was held in the matter from June 12 –13, 2001 in Los Angeles, California. Plaintiff paid the FICA taxes on approximately 4.5 million dollars that she received from her former employer, Kingston Technology, Inc. ("Kingston") in 1996 and 1997, after working for said company from 1990 to 1996. The taxes were paid to the United States ("defendant") through the Internal Revenue Service ("the IRS"). In that connection, plaintiff signed a 'Resignation Agreement and General Release' ("the Agreement") with Kingston upon her departure from said company on November 15, 1996, which contained a number of binding clauses on her.

Plaintiff argued at trial that the 4.5 million dollar payment was either solely, or partly, for the promises she made to Kingston pursuant to the Agreement. Conversely, defendant contends that the payment was, in fact, a severance bonus and, therefore, constitutes wages arising out of the employer/employee relationship, as defined by law, and clearly is subject to the FICA tax. For the reasons stated hereinafter, the court holds that the 4.5 million dollar payment Ms. Donnel received from Kingston does, in fact, constitute taxable wages, as defined by law, and, as such, plaintiff is not entitled to a refund of the FICA taxes.

### FACTS AND PROCEDURAL HISTORY

Plaintiff began working at Kingston as an at-will employee (without a formal employment contract) on November 12, 1990, as a sales manager for the company's computer memory products, i.e., its sole business. Her initial salary was $55,000 per annum, which was incrementally increased to $250,000 by October 1995. During this period, plaintiff was promoted, at some unspecified time(s), to the position of 'Director of Sales,' and then, on July 31, 1995, to 'Vice President of Sales.' In the time that plaintiff was employed by Kingston, and up to the time she officially resigned, on November 15, 1996, the company grew dramatically, primarily, due to her efforts.

For example, Kingston's total gross domestic sales grew from 120 million dollars in 1990 to 1.2 billion dollars in 1996. By her own admission, plaintiff testified that, despite her minimal knowledge of the technical aspect of computers, she was, in fact, responsible for "ninety percent"(90%) [1] of this phenomenal growth in sales. Tr. 29.[2] This contention was also corroborated by Kingston's co-founder, David Sun ("Mr. Sun"), who testified that: "she did a good job … the sales go up substantially, we have the data for you." Tr. 235. Additionally, plaintiff was also responsible for training and hiring most of the sales staff at Kingston, which grew from a low of 3 salespeople to 80 salespeople during her tenure.

In September 1996, just over two months before plaintiff's resignation, the two co-founders of Kingston, Mr. Sun and John Tu ("Mr. Tu"), sold 80% of the company to a

---

[1]. To compute the actual dollar increase in gross sales attributable to Ms.. Donnel, the court uses the figures above and the following simple formula:

$1,200,000,000 (1.2 billion in gross 1996 sales)—$120,000,000 (gross 1990 sales)= $1,080,000,000 (net increase in gross sales over the period) X .90 (percentage attributable to plaintiff) = $972,000,000 (net dollar increase in gross sales attributable to plaintiff). As a percentage, this increase represents an 810% increase in gross sales attributable to plaintiff from 1990 to 1996.

[2]. "Tr." in this opinion is a reference to the official transcript of the trial proceedings of this case, which was held on June 12–13, 2001.

Japanese corporation called Softbank.[3] Shortly thereafter and also in September 1996, plaintiff informed Mr. Sun that she would soon resign from the company. Plaintiff testified at trial that the transfer of ownership of Kingston to Softbank had "quite a bit" of influence on her decision to resign. Tr. 37. When plaintiff first informed Mr. Sun that she would be resigning, the two apparently began to negotiate a payment to her, the reason for which is at the center of the dispute in this instant case. During the initial negotiation, which took place in Kingston's parking lot on an unspecified evening in September 1996, the two were highly contentious. Causing this tension, according to the record, was that plaintiff initially requested seven million dollars and supported her request with the fact that the preceding Vice President of Sales at Kingston received that amount upon his resignation in 1994. Tr. 157–58.

On the next day after Mr. Sun's and plaintiff's initial negotiation, the two finally amicably agreed, again in Kingston's parking lot, on a payment of 4.5 million dollars ("the payment"). Plaintiff admitted at trial, upon being refreshed, that in negotiating with Mr. Sun about the amount of the payment, she had told him the following to support her position: "I was a valuable employee of the company; that I had done all that was asked of me plus more; that I stayed in the company longer than he and I assumed I would." DX16,[4] Pl.'s Dep. at 19; Tr. 111.

When repeatedly asked on the stand why plaintiff received such a large sum of money, Mr. Sun testified that he had promised her in the past, during her employment at Kingston, that he would "take care" of her if she "d[id] a good job," and that he wished to reward plaintiff for "working hard." Tr. 228, 234. Additionally, when asked by defense counsel how he "rationalized paying Karen Hodo [Ms. Donnel] 4.5 million dollars," Mr. Sun stated the following:

First of all we must come up with some number that I have to rationalize. So maybe 4.5 [million dollars] it come out. So my rationalize is because we decide, me and my partner decide to set 100 million aside for the employees.[5] At that time we only had 400 employees. So we count, I counted a, not really detailed but just think, I think if Karen would stay she is very good as Vice President Sales. Her personal reason to go to Colorado which is good for her. I'm very happy for her. So if we distribute the 100 million at that time she should get 7 to 10 years salary anyway even if she stay. At that time she is making, including bonus, 250,000 to 300,-000. So I just time 10 year, 7–10 year. So I tried to get to 4.5 so I feel we both have a good deal. So then it is about 3 million, *then for her working hard for me,* going away, want to retire, work for the community, very nice person, right. So you just have to just—*I have to justify myself otherwise I don't feel good about myself.* That is it a lot? I don't know. If it is not enough, I don't know? *I feel peace, that's all.* [sic]

Tr. 233–34 (emphasis added). Mr. Sun indicated to the court that he decided to pay, and Kingston did, in fact, pay, plaintiff the 4.5 million dollars without discussing the payment with any Softbank officials. Tr. 234. More importantly, Mr. Sun testified that he was never concerned that plaintiff would leave Kingston to go to a competitor. Tr. 236. As will be explained *infra*, these are important points which explain the reason why Kingston paid plaintiff 4.5 million dollars.

In the ensuing weeks after plaintiff informed Mr. Sun that she was resigning, she visited or contacted most of the customers she had brought to Kingston to assure them

---

3. Though not relevant to our instant decision, it is notable that Mr. Sun and Mr. Tu bought 100% of Kingston back from Softbank in 1999 with each retaining 50% ownership. Tr. 225. Gross sales of the company in the year 2000 were 1.7 billion dollars. *Id.*

4. In this opinion references to "DX" indicate defendant's exhibits admitted into evidence and, likewise, references to "PX" indicate plaintiff's exhibits.

5. The court notes that this 100 million dollar fund was created from Mr. Sun's and Mr. Tu's personal funds, which they received from the proceeds of the sale of Kingston to Softbank.

that there were "no hard feelings" between her and Kingston and that "it was business as usual." Tr. 41. In other words, plaintiff, by such communications, sought to assure that her leaving Kingston would not also cause her customers to cease doing business with Kingston. In addition to this function, plaintiff was to sign a document entitled 'Resignation Agreement and General Release' ("the Agreement") on the day of her resignation, November 15, 1996.[6]

The Agreement, which plaintiff participated in drafting, specified the amount she would receive upon her resignation and also contained promises by plaintiff to abstain from certain activities for a period of one-year. Plaintiff did, indeed, sign said Agreement on November 15, 1996, her last day at Kingston, and she testified that during the signing various individuals of Kingston's management, some of whom she considered friends, were: "short, curt and to the point; almost angry [and] ... very quiet." Tr. 45–46. According to plaintiff's testimony, the conduct of the Kingston officials at the signing made her "upset, very shocked." Tr. 46. Furthermore, plaintiff stated that she felt that if she failed to sign said Agreement she would not have been paid any part of the 4.5 million dollars. Notwithstanding this final point, if Kingston's management was ever personally angry at Ms. Donnel, such was apparently abated, as plaintiff testified that there are no hard feelings between her and Kingston's management at the present time. Tr. 146. Moreover, plaintiff testified that she even went to the company's Christmas party in December 1996—less than two (2) months after her resignation—and received a warm welcome by Kingston officials.

Plaintiff received the full amount of the 4.5 million dollars,[7] less taxes, by January 2,

1997, and all of the *income taxes* due on said amount have been paid, a point which is not in dispute in this matter. Additionally, Ms. Donnel, through Kingston's withholdings, timely paid $69,305[8] of FICA taxes on the payment and neither party disputes that said amount is the correct FICA computation on 4.5 million dollars. What is in dispute is the nature of the payment to plaintiff and whether part of it, none of it, or all of it, *constitutes wages subject to the FICA tax.*

The Agreement plaintiff signed contains a number of 'non-compete' and confidentiality clauses designed to protect Kingston's business from plaintiff if she tried to again enter the computer memory sales business at some future time. Particularly regarding the non-compete component, the Agreement states:

> In furtherance of protecting Kingston's Confidential Information and goodwill, Hodo [plaintiff] agrees that for a *period of one (1) year* from her execution of this Agreement, she will not directly or indirectly for any other person or entity (a) call on, solicit, or take away, or attempt to call on, solicit, or take away, any present customer of Kingston for the benefit of any of our competitors, or (b) hire or solicit the employment of any person employed or retained as an employee, independent contractor, or consultant by Kingston.

Resignation Agreement, ¶ 6 (November 15, 1996). Interestingly, this covenant did not operate to prevent plaintiff from doing the proscribed activities for herself.

Regarding the confidentiality component, the Agreement states:

> Hodo agrees that she will not at any time in the future reveal, disclose, divulge or make known any of such Confidential Information, directly or indirectly, to any

---

6. We note that the record is unclear as to exactly who from Kingston requested, or perhaps required, Ms. Donnel to sign this Agreement. Mr. Sun testified that he had only a limited involvement in the drafting of the Agreement.

7. The court notes that this payment came from Kingston's corporate funds and not from Mr. Sun's and Mr. Tu's personal bonus funds of 100 million dollars mentioned by Mr. Sun, which was created with the co-founders' own monies in order to reward *current* Kingston employees for their *past* hard work and dedication. Tr. 232.

We note this side issue because evidence was adduced at trial concerning this fund, with both sides postulating arguments regarding the relevancy of the fund. Regardless, we find the existence of this fund inapposite to the issues we face in the instant matter because Ms. Donnel was never paid from this fund.

8. This amount represents the total claim for specific money damages prayed for in the complaint.

person or entity, or use the same in any manner whatsoever for any other person or entity. All such Confidential Information is and shall remain the exclusive property of Kingston.

\* \* \* \* \* \*

Hodo represents and agrees that she will not hereafter make orally or in writing any statement of a disparaging or critical nature regarding Kingston, its past or present officers, directors, executives, managers, employees, agents or customers, or its past or present business operations. Kingston represents and agrees that it will not hereafter make orally or in writing any statement of a disparaging or critical nature regarding Hodo.

*Id.* at ¶¶ 5 *and* 11. Whereas the record indicates that Kingston used resignation agreements in the past for other employees who resigned, the parties stipulated that Kingston did not have a standard resignation agreement. Furthermore, nothing in the record indicates that plaintiff failed to comply with any provision of the Agreement. Likewise, there is nothing in the record that indicates Kingston failed to comply with its end of the Agreement.

Regarding the purpose of the Agreement and the nature of the payment under it, the Agreement states:

Hodo represents that she is signing this Agreement voluntarily and with a full understanding of and agreement with its terms for the purpose of receiving *additional pay* beyond that normally provided by Kingston's policies and practices.

\* \* \* \* \* \*

Hodo agrees that she is not entitled to receive, and will not claim, any right, benefit, or *compensation* other than what is expressly set forth above.

*Id.* at ¶¶ 3 *and* 18 (emphasis added).

Plaintiff testified that had she not signed the agreement, she would have solicited customers from Kingston and would have tried to get former employees of Kingston to join her in doing so. In other words, plaintiff implied to the court that one of the reasons she left Kingston was to go into the computer business on her own and that she could

not do so because of the Agreement she signed.

Furthermore, plaintiff testified that she had formed her own corporation called KHD & Associates ("KHD") at some unspecified time after she gave notice of her resignation to Mr. Sun, with the purpose of using the corporation to work within the computer industry. After signing the Agreement on November 15, 1996, however, Ms. Donnel testified that she had decided against using the corporation to solicit business as said Agreement would frustrate her goals in that regard, and, eventually, she dissolved KHD. Interestingly, plaintiff failed to produce a single piece of evidence showing the actual existence of KHD.

Plaintiff received the first $200,000 of the 4.5 million payment by check dated November 18, 1996. Of this amount, $2,900 was withheld by Kingston and paid to the IRS as FICA taxes. The balance of 4.3 million dollars was paid to plaintiff by check dated January 2, 1997, and included FICA withholdings of $66,405. These withholdings aggregate $69,305, the total amount specifically prayed for in plaintiff's complaint. The court observes that the check stubs for both of these payments specifically denote that they are *"severance"* payments under the heading *"earnings."* DX 4 *and* DX10 (emphasis added). Moreover, the gross amounts paid, *i.e.,* $200,000 and $4,300,000, are also indicated on the check stub as "gross *pay*." *Id.* (emphasis added). In addition, the check stubs list plaintiff's employee number and contain headings for employee-type information, including "vacation," "sick," and "overtime." Given all of the foregoing, the aforementioned checks and check stubs clearly appear to the court to be, in essence, paychecks. *See infra* at 385.

Initially, plaintiff filed two requests with the IRS, in November 1997; for a refund of the $69,305 FICA taxes previously withheld and paid to the United States on the 4.5 million payment to her from Kingston. The IRS disallowed plaintiff's requests for the refund, by letter dated December 30, 1997, and, subsequently, denied all of her appeals of the disallowance by February 9, 1998. As

a result of the foregoing, Ms. Donnel filed this instant single-count complaint for $69,305 plus interests and costs on December 29, 1999. Defendant responded to plaintiff's complaint on February 28, 2000, and, after discovery was conducted, a trial was held in the matter on June 12 and 13, 2001 in Los Angeles, California.

We note that defendant has not challenged plaintiff's claim on any jurisdictional grounds, and we further note that there are no jurisdictional impediments which would divest us of jurisdiction over her claim. Accordingly, we will now discuss the applicable law regarding the merits of plaintiff's claim.

## DISCUSSION

### I. LEGAL BACKGROUND

#### A. *Introduction—Jurisdiction in this Court*

Jurisdiction over the subject matter in this case is initially conferred on this court by the Tucker Act, which requires that a plaintiff claim an independent substantive right enforceable against the United States. 28 U.S.C. § 1491. It does not, however, by itself "create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), *quoting United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). As such, to launch a viable claim in this court under the Tucker Act's granting of jurisdiction, a plaintiff must find an express waiver of sovereign immunity by the government, which "cannot be implied but must be unequivocally expressed." *Saraco v. United States*, 61 F.3d 863, 864 (Fed.Cir.1995), *quoting United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

The Tucker Act states, in relevant part, as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon *any claim against the United States* founded either upon the Constitution, or any Act of Congress or *any regulation of an executive department*

... or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphasis added).

Therefore, "[f]or a plaintiff's claim to be jurisdictionally sound, there must exist a statute [or] regulation ... distinct from the Tucker Act itself, that specifically allows the monetary relief plaintiff requests." *Son Broadcasting, Inc. v. United States*, 42 Fed. Cl. 532, 535 (1998). The statute by which plaintiff files her action is 26 U.S.C. § 7422, *see* Pl.'s Comp. at ¶ 4, which states in relevant part:

(a) No suit prior to filing claim for a refund.-No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected ... until a claim for refund or credit has been duly filed with the Secretary [IRS] ....

\* \* \* \* \* \*

(f)(1) General rule.—A suit or proceeding referred to in subsection (a) *may be maintained only against the United States* ....

(emphasis added). The record shows that plaintiff did, indeed, file a request for a refund with the IRS and that it was subsequently denied, thus, she has fulfilled the requirements of § 7422. As such, in this instant case, the waiver of sovereign immunity, and the substantive actionable right plaintiff has in this court, comes from the Tucker Act's clause, as stated above, and 26 U.S.C. § 7422, which allows suits against the United States after a plaintiff has duly filed a refund claim with the IRS.

#### B. *Plaintiff's Burden*

It is well established that "[i]n a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover. It is not enough for him to demonstrate that the assessment of the tax for which refund is sought was erroneous in [only] some respects." *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (citation omitted). There is a "presumption of correctness" in the government's assessment of a tax on an individual. *Id.* This presumption can be overcome if a plaintiff can demonstrate that the total assess-

ment was erroneous. *Luce v. United States,* 4 Cl.Ct. 212, 222 (1983). In other words, "[t]his means that not only must ... [plaintiff] establish that the assessment was erroneous, but also the *amount* that is correct." *Id.* (emphasis added).

This important and established bedrock principle of tax claims against the United States, thus, guides us in our evaluation of plaintiff's action herein. Accordingly, Ms. Donnel has the burden of establishing that the FICA taxes were erroneously assessed against her by the IRS, and she must also prove the specific amount, if any, of refund she is entitled to as a result. As will be shown later in this opinion, plaintiff has failed to meet her fundamental trial burden.

### C. *The FICA Statute and What Plaintiff Must Prove to Prevail on Her Claim*

The statute that imposes the FICA tax on plaintiff is 26 U.S.C. §§ 3101(a), 3121(a), and (b) (hereinafter referred to as "the FICA statute"), which states the following in relevant part:

> 3101(a) **Old-age, survivors, and disability insurance.**—In addition to other taxes, there is hereby imposed on the income of every individual a tax equal to the following percentages of the *wages* (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b)) . . . .
>
> 3121. **Definitions (a) Wages.**—For purposes of this chapter, the term *"wages"* means *all remuneration for employment* . . . .
>
> **(b) Employment.**—For purposes of this chapter, the term "employment" means *any service,* of whatever nature, performed . . . by an employee *for the person employing him* . . . .

(emphasis added). Furthermore, the Code of Federal Regulations adds that: "[t]he name by which the remuneration for employment is designated is immaterial. Thus, salaries, fees, *bonuses,* and commissions on sales or on insurance premiums, are wages if paid as compensation for employment." 26 C.F.R. § 31.3121(c) (emphasis added).

We note that the language of the above statute, particularly the definitions, have remained essentially the same since 1945. *See Social Security Board v. Nierotko,* 327 U.S. 358, 362–63, 66 S.Ct. 637, 90 L.Ed. 718 (1946). Also of great importance is the widely-known purpose of the statute, which is to "provide funds through contributions by employer and employee for the decent support of elderly work[ers] ... who have ceased to labor." *Id.* at 364, 66 S.Ct. 637. There are a number of specific exceptions to what constitutes wages under the FICA statute, but plaintiff does not allege that she, as an individual, falls within any of them, nor does she allege that the 4.5 million dollar payment itself falls within any specific exception to the statute.

What plaintiff has alleged is that the payment, by definition, is not a "wage." In other words, the payment was not "remuneration for employment" under the statute. 26 U.S.C. § 3121(a). Accordingly, we agree with plaintiff that *if* the 4.5 million dollar payment, by definition, was not a wage, *then* it is not subject to FICA taxation. This is the main element plaintiff must prove to prevail on her claim. Therefore, the purpose, or reason, plaintiff was paid the 4.5 million dollars is relevant to the instant main issue of this case, to wit, whether the payment *is a wage. Associated Electric v. United States,* 226 F.3d 1322, 1327 (Fed.Cir.2000) ("The testimony [of the CEO] of Associated, supports the conclusion that the payments [made to plaintiff] were intimately related to and arose from the *employer-employee relationship,* and thus were 'wages.'") (emphasis added). The following section analyzes both parties' positions relative to the FICA statute and the relevant cases interpreting it, and, ultimately, renders our final decision denying plaintiff's claim.

## II. APPLICATION OF THE LAW TO THE CASE AT BAR

### A. *Introduction—Analysis of the FICA Statute*

We initially begin our analysis of FICA with the "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the

statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Regarding the relevant FICA provisions herein, however, the definition of wages—"*all* remuneration *for* employment"—is very broad and all-encompassing, which, if read literally, could operate to include *every* payment by an employer to an employee. 26 U.S.C. § 3121(a) (emphasis added). As such, the court will "consider the object and policy of the statute," in addition to the literal words "all remuneration for employment." *Id.; Assoc. Electric,* 226 F.3d at 1326. In this vein, the Federal Circuit has held that "Congress intended to impose FICA taxes on a *broad range* of employer-furnished remuneration in order to accomplish the remedial purpose of the Social Security Act." *Id.* (emphasis added). This tenet is well established, and, as plaintiff even concedes, must guide this court in its analysis.

With the FICA statute's broad purpose in mind, the phrase "all remuneration for employment," which defines the term 'wages' under the statute, has been consistently held by courts to mean remuneration "not only for work actually done but the *entire employer-employee relationship* for which compensation is paid to the employee by the employer." 26 U.S.C. § 3121(a); *Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637 (emphasis added); *see Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir.1998); *Abrahamsen v. United States,* 228 F.3d 1360, 1364 (Fed.Cir.2000); *and Assoc. Electric,* 226 F.3d at 1326. Remuneration for employment that could fit the definition of a 'wage' under the FICA statute can even "include[ ] certain compensation in the employer-employee relationship for which no actual services were performed." *Gerbec v. United States,* 164 F.3d 1015, 1026 (6th Cir.1999).

Thus, the term 'wages' encompasses a very high percentage of payments made by an employer to an employee, or former employee. We should note at this juncture, however, that the term 'wage' does not encompass each and every payment from an employer to an employee. Recently, at least one Circuit Court has succinctly stated this point as follows:

> Although wages and employment are read broadly in the FICA context, clearly not all payments by employers to employees constitute wages. Wages usually are income, but many items qualify as income and yet clearly are not wages.[9] The payments *must be remuneration for services* provided by the employee to his employer to be subject to FICA taxes.

*N. Dakota State Univ. v. United States,* 255 F.3d 599, 603 (8th Cir.2001) (citations omitted) (emphasis added).

 The Eighth Circuit's statement that—"[t]he payments must be remuneration for services provided by the employee" is obviously in some tension with the Sixth Circuit's ruling cited above that the phrase 're-muneration for employment' "includes certain compensation in the employer-employee relationship for which no actual services were performed." *Gerbec,* 164 F.3d at 1026; *N. Dakota,* 255 F.3d at 603; 26 U.S.C. § 3121(a). We reconcile the two by holding that the Eighth Circuit's phrase "must be remuneration for services" means only that Ms. Donnel must have generally been in the service of Kingston, and must have received the payment in recognition of that service in order for it to be considered a wage. We will stop short of ruling, however, that she must have performed a particular service or productive activity which can be specifically tied to the 4.5 million dollar payment in order for said payment to be considered wages under the FICA statute. Stated differently, under the law, as we read it, a bonus-type payment made to an employee, such as Ms. Donnel, on this record, in grati-

---

9. Defendant raised the issue that if the 4.5 million dollar payment was not wages, plaintiff could then owe self-employment FICA taxes pursuant to 26 U.S.C. §§ 1401 and 1402. As there is no evidence in the record that plaintiff received the payment "from any trade or business carried on by [her]," and plaintiff does not argue she received the payment as a self-employed individual, the court holds that this tax is inapplicable. *Id.* at § 1402(a). In any event, the court's ultimate holding that the payment was, indeed, a *wage* renders this issue moot.

tude for the employee's hard work and success, does not have to be logically tied to specific tasks or productive activity that that employee performed in order for it to be considered a wage. For example, consider a meritorious bonus in appreciation for past services rendered.

## B. *Purpose of the Agreement*

■ We begin our discussion of Kingston's *purpose* in paying plaintiff 4.5 million dollars with the *purpose* of the Agreement made between plaintiff and Kingston. Plaintiff argues that the plain language of the Agreement indicates that it was intended to bind her to certain promises and, therefore, said Agreement establishes that the only reason, or, at least, the main reason, she was paid the 4.5 million dollars was to bind her to those promises. The Agreement is a contract between plaintiff and Kingston, and defendant here is an unrelated third-party. Even so, plaintiff is correct in that the interpretation of the Agreement is relevant to this instant matter if the court is to fully understand the *purpose* of the 4.5 million dollar payment, and thus whether it is a 'wage' as defined under the FICA statute. In other words, the parties' main dispute is over the purpose of the 4.5 million dollar payment and, thus the reason for the Agreement is relevant.[10] Contract interpretation is a question of law and, thus, regarding a dispute "we look to the language of the contract to resolve it." *Textron Defense Systems v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998).

First, the Agreement contained a number of confidentiality clauses designed to protect Kingston business secrets. *See supra* at 378–79; Resignation Agrmt. at ¶¶ 5, 11. Confidentiality agreements between employees and employers are often standard practice in the business world, and by having plaintiff sign one, Kingston was, for the most part, protecting information that it already owned in full. *See, e.g., Union Pacific RR. v. Mower*, 219 F.3d 1069, 1074 (9th Cir.2000)

("The existence of an express agreement is relevant both in determining whether a particular employee is bound by a duty of confidentiality and in defining the scope of that duty."). Thus, plaintiff did not likely give up much by agreeing to be bound by a confidentiality agreement, which required her to abstain from releasing information owned by Kingston.

With regard to the non-compete component of the Agreement, *supra* at 378, the court notes that, while Kingston did receive a benefit from this component, plaintiff apparently continued to retain the right to solicit customers for herself, and said non-compete promise for soliciting Kingston's customers on behalf of others was for only one (1) year. Considering these two points, the non-compete component would definitely be worth quite a bit more to Kingston had the period been longer, and had plaintiff been prohibited from competing with Kingston on an individual basis. In any event, we must agree with plaintiff that Kingston did, indeed, receive at least some benefit from this provision.

Regarding the Agreement's purpose, however, it specifically stated that it was "for the purpose of [plaintiff] receiving *additional pay* beyond that normally provided by Kingston's policies and practices." *See supra* at 379; Resignation Agrmt. at ¶ 3 (emphasis added). Furthermore, the Agreement states: "Hodo [plaintiff] agrees that she is not entitled to receive and will not claim any ... *compensation* other than what is expressly set forth above." *See supra* at 379; Resignation Agrmt. at ¶ 18 (emphasis added). If the court is to give the two terms 'additional pay' and 'compensation' their ordinary meaning in the context of the Agreement and her relationship with Kingston, the purpose of the 4.5 million dollar payment to plaintiff is for a wage.

For example, the noun "pay" is defined as—"money given in return for work done:

---

10. The parties made 'much ado about nothing' over the parole evidence rule concerning the testimony of Ms. Donnel for plaintiff and Mr. Sun for defendant on the purpose of the Agreement. We will suffice it to say that neither parties' objections pursuant to the above rule were granted at trial, and each witness testified as to *relevant* matters regarding the Agreement, to wit, the purpose of the parties in entering the Agreement *and* why Kingston paid plaintiff 4.5 million dollars.

WAGES." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 863 (1988). "Compensation" is defined as—"something given or received as payment or reparation, for ... services ...." *Id.* at 290. Therefore, the dictionary definitions of these two terms, when taken in the context of the Agreement, indicate to the court that said Agreement clearly states the payment is "remuneration for employment." 26 U.S.C. § 3121(a).

Plaintiff argued at trial that, despite the above phrases, the purpose of the Agreement and, thus, the payment, was solely, or at least primarily, for the confidentiality/non-compete benefits given to Kingston. In other words, plaintiff argued that the court should look beyond the ordinary meaning of the terms 'pay' and 'compensation' to determine the purpose of the 4.5 million dollar payment. It is true that the Agreement does indicate a two-fold purpose, one of *severance/bonus* (a benefit bestowed on plaintiff for her good service), and one of non-compete and· confidentiality (a benefit given wholly to Kingston). If Ms. Donnel, however, intended to show that the non-compete/confidentiality purpose is the sole purpose of the Agreement, she must have, at trial, "adduce[d] proof which in an action between the parties to the agreement would be admissible to alter that construction," *i.e.,* showing that the benefit to Kingston (non-compete/confidentiality) is the main purpose of the Agreement. *Commissioner of Internal Revenue v. Danielson,* 378 F.2d 771, 775 (3rd Cir.1967). She has wholly failed to do so.

As will be demonstrated in the following section, the testimony of Mr. Sun, the person who authorized the payment to plaintiff, clearly establishes, and requires a finding, that the 4.5 million dollar payment to her was, primarily, for severance pay in consideration for her past services rendered, *i.e.,* for her hard work and success at Kingston. That is to say, the plain fact that she increased sales at the company by over one billion dollars, representing an over 800% increase, clearly supports his testimony that the payment was given to plaintiff in appreciation for past services rendered. Thus, the

evidence at trial supports the plain language of the Agreement which states, *inter alia,* that the Agreement was "for the purpose of [plaintiff] receiving additional *pay* [wages] beyond that normally provided by Kingston's policies and practices." Resignation Agrmt. at ¶ 3 (emphasis added).

### C. *Purpose of the Payment*

As stated above, in order for the court to determine if the payment is a wage, we must look to Kingston's purpose in giving Ms. Donnel 4.5 million dollars. In reviewing the record, the court finds that it was Mr. Sun, one of Kingston's co-founders, who ultimately decided what sum would be paid to plaintiff, and, therefore, his reasons for paying her are imputed to Kingston. Mr. Sun's reasons for paying plaintiff, as indicated earlier, were personal. As shown by the record, his decision to pay her was not a forward-looking business determination borne out of concerns that plaintiff would go to a competitor within a year and take away some of Kingston's customers. *Supra* at 377. He authorized the 4.5 million dollar payment to her in recognition of and appreciation for her hard work and astounding results, *i.e.,* over an 800% increase in gross sales from 1991 to 1996, representing nearly a 1 billion dollar net increase.

The court arrives at this conclusion considering the following testimony of Mr. Sun: 1) he promised plaintiff in the past that he would "take care" of her if she "d[id] a good job;" 2) he paid plaintiff the 4.5 million dollars to reward her for "working hard;" 3) he felt he had to "justify" making the payment to plaintiff, otherwise he would not "feel good" about himself; 4) he felt "peace" about the decision to pay plaintiff the 4.5 million dollars; and 5) he was never concerned that plaintiff would leave Kingston to go to a competitor. *See supra* at 377; Tr. 223–36. The mere fact that the record shows that Ms. Donnel increased sales by her own efforts by such an astounding amount, *i.e.,* over 800% and nearly 1 billion dollars, is compelling evidence in and of itself supporting a 4.5 million dollar severance payment.[11] Conse-

---

11. An interesting comparison can be made with

the dollar increase in sales attributable to plain-

quently, the court holds that the 4.5 million dollars was authorized by Mr. Sun as severance pay to plaintiff primarily in consideration for past laudatory services rendered to Kingston.

In fact, the actual checks themselves show that Ms. Donnel received the 4.5 million dollars as a severance bonus. For instance, both check stubs, ostensibly attached to the checks, indicate the amount paid under a main heading named "earnings," and a specific heading titled "*severance.*" *See supra* at 380; DX 4 *and* 10. Furthermore, the amount stated as paid on each stub is also listed under the title "gross *pay.*" *Id.* The balance of the check stubs contains boxes for employee-type information under the titles, *inter alia,* "vacation," "sick," and "overtime" pay. *Id.* As such, it is apparent that Ms. Donnel was paid with an employee-type paycheck, and, thus, the court finds this evidence very probative to the definitive question of whether or not the 4.5 million dollar payment was for severance. Considering this evidence, and the evidence above, to wit: 1) plaintiff's incredible success in increasing Kingston's sales; 2) Mr. Sun's intention to reward her for her past service; and 3) the illuminating language of the Agreement— "for the purpose of receiving additional *pay,*" *supra,* we are constrained to hold, on this record, that the *primary purpose* of the 4.5 million dollar payment to Ms. Donnel was for severance *pay.*

The dictionary definition of "severance pay" is: "[a] sum of money usu. [sic] based on length of *employment* that an *employee* is eligible for on termination." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1068 (1988) (emphasis added). In the *instant* case, the sum was determined, by Mr. Sun, based on plaintiff's incredible success in increasing sales, as opposed to being based solely on her years of service. In any event, the concept of severance in this case is the same as the definition above in the context of the instant issue, *i.e.,* whether the payment was a wage.

It is well established that "severance payments that were not conditioned on a release

of any claims ... would constitute 'wages' because they would be compensation paid to the employees by their employer for the employer-employee relationship." *Abrahamsen,* 228 F.3d at 1364. "Payments for hard work and faithful service arise directly from the employee-employer relationship and are payments which *recognize the value or character of the services performed* for the employer." *Assoc. Electric,* 226 F.3d at 1327 (emphasis added). Plaintiff was, indeed, paid the 4.5 million dollars primarily for her hard work and faithful service, as the record clearly shows by the testimony of Mr. Sun. This testimony was not adequately contradicted by any evidence produced by plaintiff. Therefore, we hold that because the *primary purpose* of the payment to plaintiff was for severance pay, the payment is a wage under the FICA statute.

Finally, plaintiff argued at trial that with her last paycheck on her resignation day, she was fully paid for all of her services to Kingston, and that she had ceased to be an employee when the 4.5 million dollar payment was made to her *after* her termination. Thus, the payment, plaintiff argues, could not be for her services rendered. We find this argument unpersuasive considering the relevant case law, which interprets the clause "all remuneration for employment" broadly in the context of the employer/employee relationship. 26 U.S.C. § 3121(a); *Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637. For example, in *Mayberry v. United States,* quoted earlier, the court held:

> The Mayberrys [plaintiffs] argue that since class members were compensated in full for all services rendered to Continental Can [as they had formerly resigned and were paid their final paychecks], no portion of the settlement award can be treated as "remuneration for employment" under § 3121. This argument treats "service" too narrowly as referring to "only productive activity" whereas § 3121(b) means "not only work actually done but the entire employer-employee relationship for which

tiff, which is $972,000,000, *supra* n. 1, and the $4,500,000 payment given to her. The payment Ms. Donnel received represents less than ½ of 1% of the total increase in sales she obtained for Kingston.

compensation is paid to the employee by the employer."

151 F.3d at 860, *quoting Nierotko*, 327 U.S. at 365–66, 66 S.Ct. 637.

In fact, the case at bar is an even greater indication than the case cited *supra* of "remuneration for employment," considering Mr. Sun's intention, mentioned earlier, to reward plaintiff for her past hard work and outstanding success at Kingston. Therefore, that plaintiff had ceased to be an employee when the 4.5 million dollar payment was actually made to her does not in any way obviate the purpose of the payment, *i.e.*, to reward her for her past services rendered. Consequently, we are *unpersuaded* by plaintiff's provincial argument that she had already resigned and had been paid her final paycheck prior to receiving the 4.5 million dollar payment, thus rendering said payment as a non-wage.

### D. *The Court Will Not Bifurcate the Purpose of the Payment*

■ Plaintiff has not proven to the court that even part of the payment was a non-wage. That is not to say that there is not a scintilla of evidence on plaintiff's part in this regard, as evidence was adduced at trial that there likely was a non-wage component of the 4.5 million dollar payment. However, plaintiff has failed to establish that Kingston or Mr. Sun were ever concerned that she would attempt to take customers away from Kingston after she resigned. *See supra* at 377; Tr. 236. Her unsupported testimony at trial about her future business plans and her newly-formed corporation is unpersuasive to the court. Thus, plaintiff has failed to prove that the purpose of Kingston's 4.5 million dollar payment to her was solely to obtain the confidentiality and non-compete components of the Agreement.

In a similar vein, plaintiff has also failed to prove, by any measurable degree of specificity, even an approximate value to Kingston of her signing the non-compete Agreement; but rather the record persuasively establishes a high degree of a severance/bonus component to the payment. *See supra* at 385–86. In order to prevail on her instant claim, plaintiff must show a specific amount, or, at least, a supportable approximate value to Kingston, proving the allocable portion of the payment that was intended for any non-wage purpose. *Assoc. Electric*, 226 F.3d at 1328–29 ("Although securing the UMWA's [the labor union's] agreement not to strike was a critical concession for Associated, it was not the *sole motivation* for Associated to offer the early out plan [payments to the employees]. . . . [thus] [t]he early out payments arose out of the employment relationship between Associated and its employees. Consequently, the payments fit within the statutory definition of 'wages.' ") (emphasis added). Here at bar, plaintiff has failed to show such a specific value.

For example, the court in *Abrahamsen* held:

> As set forth above, the payments at issue were at least partially motivated by IBM's desire to settle any claims departing employees may have had against it [a non-wage purpose]. The employees, however, have *failed to demonstrate* that the payments [or any particular amount of the payments] were so closely related to such claims that they constituted settlement payments instead of *severance payments* made to compensate for the employer-employee relationship.

228 F.3d at 1364–65 (emphasis added). Ms. Donnel has proven no more than the plaintiffs in *Abrahamsen*.

The evidence concerning Mr. Sun's personal bonus fund—from which he has given monies to *current* employees—falls far short of showing the actual severance component of Ms. Donnel's 4.5 million dollars, and, as mentioned earlier, is irrelevant. *See supra* at n. 7. Specifically, plaintiff was not paid the 4.5 million dollars from this fund (*i.e.*, his personal funds), but from Kingston's funds, and with a Kingston paycheck replete with all the indicia of an employee-type paycheck. *See supra* at 379 *and* 385.

Considering this evidence, and all of the above-mentioned factors, the court finds no reasonable basis by which we could bifurcate the purpose of the 4.5 million dollar payment to Ms. Donnel between a severance component and a component based on her contrac-

tual promises. As a result, we are constrained to hold that, because the *primary purpose* of the payment was for a severance bonus, and plaintiff has failed to demonstrate an actual amount which would constitute payment for her promises contained in the Agreement, the entire payment was, thus, a taxable wage.

### E. *Plaintiff's Cited Cases Are Unpersuasive*

None of the cases plaintiff cites involve payment of severance or a payment for a non-compete/confidentiality agreement. The cases plaintiff cites in support of her position that the 4.5 million dollar payment was not a wage are totally distinguishable on the facts from her situation, and thus not instructive to us. For example, the claimant in *Newhouse v. McCormick* received a damages award from a prospective employer based on employment discrimination claims, but had never actually been employed by the defendant. 157 F.3d 582 (8th Cir.1998). The *Newhouse* court held that "there is simply no basis for concluding that a current or previous employer-employee relationship existed between [the claimant and defendant]," and thus the damages award could not be wages. *Id.* at 585. The instant case is quite distinguishable, as Ms. Donnel had been employed by Kingston just prior to receiving the payment and, therefore, there was an employer-employee relationship between the two. Thus, *Newhouse* is inapposite.

In *Redfield v. Ins. Co. of N. America*, the claimant was awarded personal injury damages against his employer on various discrimination claims. 940 F.2d 542 (9th Cir.1991). The *Redfield* court correctly held that "personal injury damages are simply not 'income' as used in the FICA statutes." *Id.* at 548. Likewise, in *Dotson v. United States*, the plaintiffs received damages in a settlement award from their former employer pursuant to an ERISA (Employee Retirement Income Security Act) action, of which the personal injury portion was excludable from the plaintiffs' taxable income. 87 F.3d 682 (5th Cir. 1996). The *Dotson* court correctly held that "[t]he portion of the settlement determined to be excludable from taxable income on

remand to the district court should also be excludable from wage taxes. Damages not included in the tax code's definition of 'income' are not considered 'wages.'" *Id.* at 689. Accordingly, these two cases are easily distinguishable from the instant matter because the payment made to plaintiff here was not a damages award, but a *voluntary* payment made to Ms. Donnel by Kingston for her past superior services rendered, and such payment was certainly includable in her taxable income. The factual circumstances presented by these two cited cases are totally inapposite to those at bar.

Plaintiff also cites *N. Dakota State University v. United States, supra,* to support her position that the payment was not a wage. 255 F.3d 599 (8th Cir.2001). *N. Dakota,* however, involved professors at a university who were paid to give up their specific contractual rights to tenure, and, even though their past performance was used as a factor in determining the amount each was to receive, the court ruled that the main purpose of the payments to them was for their relinquishment of their contractual rights, not for their past services rendered. *Id.* at 606–07. Our instant plaintiff is in a much different situation. As we stated earlier, the primary purpose for which Ms. Donnel was paid the 4.5 million dollars was to compensate her for her extraordinary past services rendered to Kingston.

Finally, plaintiff cites the district court case of *Wilson v. A.M. General Corp.* as support for her argument that the 4.5 million dollar payment was not a wage. 1999 WL 1746071, 1999 U.S. Dist. LEXIS 21828 (N.D.Ind.1999). The claimant in *Wilson* was awarded damages for back pay, front pay, and future pension benefits, which the court held was not wages, after prevailing in an age-discrimination lawsuit against his former employer. *Id.* at *2. The court based its holding that the damages were not wages on the fact that defendant, A.M. General, had "succeeded in terminating its employment relationship with Mr. Wilson," and thus there was no "unbroken ... tenure of employment" between the two when the damages award was rendered. *Id.* at *2–3. Our case is distinguishable in that Ms. Donnel received

her payment *voluntarily* from Kingston as it was not an award for damages, and the payment, as we have held above, was clearly *for her past services rendered.* We note also that *Wilson* is not binding on us in any event, and is in tension with the line of Circuit Court cases previously cited which broadly define wages under the employer-employee relationship. *See Abrahamsen,* 228 F.3d at 1364, *and Assoc. Electric,* 226 F.3d at 1326. As such, *Wilson* is unpersuasive to us and we reject same. Consequently, we hold, given all of the foregoing, that the 4.5 million dollars paid by Kingston to Ms. Donnel was a *wage* under the FICA statute.

## CONCLUSION

For all of the above reasons, the court hereby DENIES plaintiff's claim for relief on the merits. Therefore, the Clerk shall enter judgment in favor of defendant, dismissing, with prejudice, plaintiff's complaint in this matter. No costs.

IT IS SO ORDERED.