(Slip Opinion)     OCTOBER TERM, 2012     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WOS, SECRETARY, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES *v.* E. M. A., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, JOHNSON, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12–98.   Argued January 8, 2013—Decided March 20, 2013

The federal Medicaid statute's anti-lien provision, 42 U. S. C. §1396p(a)(1), pre-empts a State's effort to take any portion of a Medicaid beneficiary's tort judgment or settlement not "designated as payments for medical care," *Arkansas Dept. of Health and Human Servs.* v. *Ahlborn*, 547 U. S. 268, 284. A North Carolina statute requires that up to one-third of any damages recovered by a beneficiary for a tortious injury be paid to the State to reimburse it for payments it made for medical treatment on account of the injury.

Respondent E. M. A. was born with multiple serious birth injuries that require her to receive between 12 and 18 hours of skilled nursing care per day and that will prevent her from being able to work, live independently, or provide for her basic needs. North Carolina's Medicaid program pays part of the cost of her ongoing medical care. E. M. A. and her parents filed a medical malpractice suit against the physician who delivered her and the hospital where she was born. They presented expert testimony estimating their damages to exceed $42 million, but they ultimately settled for $2.8 million, due in large part to insurance policy limits. The settlement did not allocate money among their various medical and nonmedical claims. In approving the settlement, the state court placed one-third of the recovery into escrow pending a judicial determination of the amount of the lien owed by E. M. A. to the State. E. M. A. and her parents then sought declaratory and injunctive relief in Federal District Court, claiming that the State's reimbursement scheme violated the Medicaid anti-

lien provision.  While that litigation was pending, the North Carolina Supreme Court held in another case that the irrebuttable statutory one-third presumption was a reasonable method for determining the amount due the State for medical expenses.  The Federal District Court, in the instant case, agreed.  But the Fourth Circuit vacated and remanded, concluding that the State's statutory scheme could not be reconciled with *Ahlborn.*

*Held:* The federal anti-lien provision pre-empts North Carolina's irrebuttable statutory presumption that one-third of a tort recovery is attributable to medical expenses.  Pp. 4–16.

    (a) In *Ahlborn*, the Court held that the federal Medicaid statute sets both a floor and a ceiling on a State's potential share of a beneficiary's tort recovery.  Federal law requires an assignment to the State of "the right to recover that portion of a settlement that represents payments for medical care," but also "precludes attachment or encumbrance of the remainder of the settlement."  547 U. S., at 282, 284.  *Ahlborn* did not, however, resolve the question of how to determine what portion of a settlement represents payment for medical care.  As North Carolina construes its statute, when the State's Medicaid expenditures exceed one-third of a beneficiary's tort recovery, the statute establishes a conclusive presumption that one-third of the recovery represents compensation for medical expenses, even if the settlement or verdict expressly allocates a lower percentage of the judgment to medical expenses.  Pp. 4–7.

    (b) North Carolina's law is pre-empted insofar as it would permit the State to take a portion of a Medicaid beneficiary's tort judgment or settlement not designated for medical care.  It directly conflicts with the federal Medicaid statute and therefore "must give way."  *PLIVA, Inc.* v. *Mensing*, 564 U. S. ___, ___.  The state law has no process for determining what portion of a beneficiary's tort recovery is attributable to medical expenses.  Instead, the State has picked an arbitrary percentage and by statutory command labeled that portion of a beneficiary's tort recovery as representing payment for medical care.  A State may not evade pre-emption through creative statutory interpretation or description, "framing" its law in a way that is at odds with the statute's intended operation and effect.  *National Meat Assn.* v. *Harris*, 565 U. S. ___, ___.  North Carolina's argument, if accepted, would frustrate the Medicaid anti-lien provision in the context of tort recoveries.  It lacks any limiting principle: If a State could arbitrarily designate one-third of any recovery as payment for medical expenses, it could arbitrarily designate half or all of the recovery in the same way.  The State offers no evidence showing that its allocation is reasonable in the mine run of cases, and the law provides no mechanism for determining whether its allocation is reasonable in

Syllabus

any particular case.

No estimate of an allocation will be necessary where there has been a judicial finding or approval of an allocation between medical and nonmedical damages. In some cases, including *Ahlborn*, this binding stipulation or judgment will attribute to medical expenses less than one-third of the settlement. Yet even in these circumstances, North Carolina's statute would permit the State to take one-third of the total recovery. A conflict thus exists between North Carolina's law and the Medicaid anti-lien provision.

This case is not as clear-cut as *Ahlborn* was, for here there was no such stipulation or judgment. But *Ahlborn*'s reasoning and the federal statute's design contemplate that possibility: They envisioned that a judicial or administrative proceeding would be necessary where a beneficiary and the State are unable to agree on what portion of a settlement represents compensation for medical expenses. See 547 U. S., at 288. North Carolina's irrebuttable, one-size-fits-all statutory presumption is incompatible with the Medicaid Act's clear mandate that a State may not demand any portion of a beneficiary's tort recovery except the share that is attributable to medical expenses. Pp. 7–10.

(c) None of North Carolina's responses to this reasoning is persuasive. Pp. 10–15.

674 F. 3d 290, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed a concurring opinion. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 12–98

————

## ALDONA WOS, SECRETARY, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SER- VICES, PETITIONER *v.* E. M. A., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DANIEL H. JOHNSON, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

A federal statute prohibits States from attaching a lien on the property of a Medicaid beneficiary to recover benefits paid by the State on the beneficiary's behalf. 42 U. S. C. §1396p(a)(1). The anti-lien provision pre-empts a State's effort to take any portion of a Medicaid beneficiary's tort judgment or settlement not "designated as payments for medical care." *Arkansas Dept. of Health and Human Servs.* v. *Ahlborn*, 547 U. S. 268, 284 (2006). North Carolina has enacted a statute requiring that up to one-third of any damages recovered by a beneficiary for a tortious injury be paid to the State to reimburse it for payments it made for medical treatment on account of the injury. See N. C. Gen. Stat. Ann. §108A–57 (Lexis 2011); *Andrews* v. *Haygood*, 362 N. C. 599, 604–605, 669 S. E. 2d 310, 314 (2008). The question presented is whether the North Carolina statute is compatible with the federal anti-lien provision.

I

When respondent E. M. A. was born in February 2000, she suffered multiple serious birth injuries which left her deaf, blind, and unable to sit, walk, crawl, or talk. The injuries also cause her to suffer from mental retardation and a seizure disorder. She requires between 12 and 18 hours of skilled nursing care per day. She will not be able to work, live independently, or provide for her basic needs. The cost of her ongoing medical care is paid in part by the State of North Carolina's Medicaid program.

In February 2003, E. M. A. and her parents filed a medical malpractice suit in North Carolina state court against the physician who delivered E. M. A. at birth and the hospital where she was born. The expert witnesses for E. M. A. and her parents in that proceeding estimated damages in excess of $42 million for medical and life-care expenses, loss of future earning capacity, and other assorted expenses such as architectural renovations to their home and specialized transportation equipment. App. 91–112. By far the largest part of this estimate was for "Skilled Home Care," totaling more than $37 million over E. M. A.'s lifetime. *Id.*, at 112. E. M. A. and her parents also sought damages for her pain and suffering and for her parents' emotional distress. *Id.*, at 64–65, 67–68, 72–73, 75–76. Their experts did not estimate the damages in these last two categories.

Assisted by a mediator, the parties began settlement negotiations. E. M. A. and her parents informed the North Carolina Department of Health and Human Services of the negotiations. The department had a statutory right to intervene in the malpractice suit and participate in the settlement negotiations in order to obtain reimbursement for the medical expenses it paid on E. M. A.'s behalf, up to one-third of the total recovery. See N. C. Gen. Stat. Ann. §§108A–57, 108A–59. It elected not to do so, though its representative informed E. M. A. and her parents that the

State's Medicaid program had expended $1.9 million for E. M. A.'s medical care, which it would seek to recover from any tort judgment or settlement.

In November 2006, the court approved a $2.8 million settlement. The amount, apparently, was dictated in large part by the policy limits on the defendants' medical malpractice insurance coverage. See Brief for Respondents 5. The settlement agreement did not allocate the money among the different claims E. M. A. and her parents had advanced. In approving the settlement the court placed one-third of the $2.8 million recovery into an interest-bearing escrow account "until such time as the actual amount of the lien owed by [E. M. A.] to [the State] is conclusively judicially determined." App. 87.

E. M. A. and her parents then filed this action under Rev. Stat. §1979, 42 U. S. C. §1983, in the United States District Court for the Western District of North Carolina. They sought declaratory and injunctive relief, arguing that the State's reimbursement scheme violated the Medicaid anti-lien provision, §1396p(a)(1). While that litigation was pending, the North Carolina Supreme Court confronted the same question in *Andrews, supra.* It held that the irrebuttable statutory presumption that one-third of a Medicaid beneficiary's tort recovery is attributable to medical expenses was "a reasonable method for determining the State's medical reimbursements." *Id.,* at 604, 669 S. E. 2d, at 314. The United States District Court, in the instant case, agreed. *Armstrong* v. *Cansler*, 722 F. Supp. 2d 653 (2010).

The Court of Appeals for the Fourth Circuit vacated and remanded. *E. M. A.* v. *Cansler*, 674 F. 3d 290 (2012). It concluded that North Carolina's statutory scheme could not be reconciled with "*Ahlborn*'s clear holding that the general anti-lien provision in federal Medicaid law prohibits a state from recovering any portion of a settlement or judgment not attributable to medical expenses." *Id.,* at

310. In some cases, the court reasoned, the actual portion of a beneficiary's tort recovery representing payment for medical care would be less than one-third. North Carolina's statutory presumption that one-third of a tort recovery is attributable to medical expenses therefore must be "subject to adversarial testing" in a judicial or administrative proceeding. *Id.,* at 311.

To resolve the conflict between the opinion of the Court of Appeals in this case and the decision of the North Carolina Supreme Court in *Andrews*, this Court granted certiorari. 567 U. S. ___ (2012).

## II

At issue is the interaction between certain provisions of the federal Medicaid statute and state law. Congress has directed States, in administering their Medicaid programs, to seek reimbursement for medical expenses incurred on behalf of beneficiaries who later recover from third-party tortfeasors. States must require beneficiaries "to assign the State any rights . . . to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from any third party." 42 U. S. C. §1396k(a)(1)(A). States receiving Medicaid funds must also

> "ha[ve] in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services." §1396a(a)(25)(H).

A separate provision of the Medicaid statute, however, exists in some tension with these requirements. It says that, with exceptions not relevant here, "[n]o lien may be imposed against the property of any individual prior to his

death on account of medical assistance paid or to be paid on his behalf under the State plan." §1396p(a)(1).

In *Ahlborn*, the Court addressed this tension and held that the Medicaid statute sets both a floor and a ceiling on a State's potential share of a beneficiary's tort recovery. Federal law requires an assignment to the State of "the right to recover that portion of a settlement that represents payments for medical care," but it also "precludes attachment or encumbrance of the remainder of the settlement." 547 U. S., at 282, 284. This is so because the beneficiary has a property right in the proceeds of the settlement, bringing it within the ambit of the anti-lien provision. *Id.,* at 285. That property right is subject to the specific statutory "exception" requiring a State to seek reimbursement for medical expenses paid on the beneficiary's behalf, but the anti-lien provision protects the beneficiary's interest in the remainder of the settlement. *Id.,* at 284.

A question the Court had no occasion to resolve in *Ahlborn* is how to determine what portion of a settlement represents payment for medical care. The parties in that case stipulated that about 6 percent of respondent Ahlborn's tort recovery (approximately $35,600 of a $550,000 settlement) represented compensation for medical care. *Id.,* at 274. The Court nonetheless anticipated the concern that some settlements would not include an itemized allocation. It also recognized the possibility that Medicaid beneficiaries and tortfeasors might collaborate to allocate an artificially low portion of a settlement to medical expenses. The Court noted that these problems could "be avoided either by obtaining the State's advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision." *Id.,* at 288.

North Carolina has attempted a different approach. Its statute provides:

"Notwithstanding any other provisions of the law, to the extent of payments under this Part, the State, or the county providing medical assistance benefits, shall be subrogated to all rights of recovery, contractual or otherwise, of the beneficiary of this assistance . . . . The county attorney, or an attorney retained by the county or the State or both, or an attorney retained by the beneficiary of the assistance if this attorney has actual notice of payments made under this Part shall enforce this section. Any attorney retained by the beneficiary of the assistance shall, out of the proceeds obtained on behalf of the beneficiary by settlement with, judgment against, or otherwise from a third party by reason of injury or death, distribute to the Department the amount of assistance paid by the Department on behalf of or to the beneficiary, as prorated with the claims of all others having medical subrogation rights or medical liens against the amount received or recovered, but the amount paid to the Department shall not exceed one-third of the gross amount obtained or recovered." N. C. Gen. Stat. Ann. §108A–57(a).

Before *Ahlborn* was decided, North Carolina and the state courts interpreted this statute to allow the State to "recover the costs of medical treatment provided . . . even when the funds received by the [beneficiary] are not reimbursement for medical expenses." *Campbell* v. *North Carolina Dept. of Human Resources*, 153 N. C. App. 305, 307–308, 569 S. E. 2d 670, 672 (2002). See also *Ezell* v. *Grace Hospital, Inc.*, 360 N. C. 529, 631 S. E. 2d 131 (2006) (*per curiam*). Under *Ahlborn*, however, this construction of the statute is at odds with the Medicaid anti-lien provision, which "precludes attachment or encumbrance" of any portion of a settlement not "designated as payments for medical care." 547 U. S., at 284.

In response to *Ahlborn*, the State advanced—and the North Carolina Supreme Court in *Andrews* accepted—a new interpretation of its statute. Under this interpretation the statute "defines 'the portion of the settlement that represents payment for medical expenses' as the lesser of the State's past medical expenditures or one-third of the plaintiff's total recovery." *Andrews*, 362 N. C., at 604, 669 S. E. 2d, at 314. In other words, when the State's Medicaid expenditures on behalf of a beneficiary exceed one-third of the beneficiary's tort recovery, the statute establishes a conclusive presumption that one-third of the recovery represents compensation for medical expenses. Under this reading of the statute the presumption operates even if the settlement or a jury verdict expressly allocates a lower percentage of the judgment to medical expenses. See Tr. of Oral Arg. 10, 16–17. Cf. *Andrews, supra,* at 602–604, 669 S. E. 2d, at 313.

## III
### A

Under the Supremacy Clause, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc.* v. *Mensing*, 564 U. S. ___, ___ (2011) (slip op., at 11). The Medicaid anti-lien provision prohibits a State from making a claim to any part of a Medicaid beneficiary's tort recovery not "designated as payments for medical care." *Ahlborn, supra*, at 284. North Carolina's statute, therefore, is pre-empted if, and insofar as, it would operate that way.

And it is pre-empted for that reason. The defect in §108A–57 is that it sets forth no process for determining what portion of a beneficiary's tort recovery is attributable to medical expenses. Instead, North Carolina has picked an arbitrary number—one-third—and by statutory command labeled that portion of a beneficiary's tort recovery as representing payment for medical care. Pre-emption is

not a matter of semantics. A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect.

A similar issue was presented last Term, in *National Meat Assn.* v. *Harris*, 565 U. S. ___ (2012). That case involved the pre-emptive scope of the Federal Meat Inspection Act, 21 U. S. C. §601 *et seq.* The Act prohibited States from imposing "'[r]equirements . . . with respect to premises, facilities and operations'" at federally regulated slaughterhouses. *National Meat Assn.*, 565 U. S., at ___ (slip op., at 4) (quoting §678). The State of California had enacted a law that prohibited slaughterhouses from (among other things) selling meat from nonambulatory animals for human consumption. *Id.,* at ___ (slip op., at 5) (citing Cal. Penal Code Ann. §599f(b) (West 2010)). California sought to defend the law on the ground that it did not regulate the activities of slaughterhouses but instead restricted what type of meat could be sold in the marketplace after the animals had been butchered. 565 U. S., at ___–___ (slip op., at 9–10).

The Court rejected that argument. It recognized that if the argument were to prevail, "then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the [Act's] preemption provision." *Id.,* at ___ (slip op., at 10). In a pre-emption case, the Court held, a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it.

That reasoning controls here. North Carolina's argument, if accepted, would frustrate the Medicaid anti-lien provision in the context of tort recoveries. The argument lacks any limiting principle: If a State arbitrarily may designate one-third of any recovery as payment for medical expenses, there is no logical reason why it could not

designate half, three-quarters, or all of a tort recovery in the same way. In *Ahlborn*, the State of Arkansas, under this rationale, would have succeeded in claiming the full amount it sought from the beneficiary had it been more creative and less candid in describing the effect of its full-reimbursement law.

Here the State concedes that it would be "difficult . . . to defend" a law purporting to allocate most or all of a beneficiary's tort recovery to medical expenses. Tr. of Oral Arg. 20. That is true; but, as a doctrinal matter, it is no easier to defend North Carolina's across-the-board allocation of one-third of all beneficiaries' tort recoveries to medical expenses. The problem is not that it is an unreasonable approximation in all cases. In some cases, it may well be a fair estimate. But the State provides no evidence to substantiate its claim that the one-third allocation is reasonable in the mine run of cases. Nor does the law provide a mechanism for determining whether it is a reasonable approximation in any particular case.

In some instances, no estimate will be necessary or appropriate. When there has been a judicial finding or approval of an allocation between medical and nonmedical damages—in the form of either a jury verdict, court decree, or stipulation binding on all parties—that is the end of the matter. *Ahlborn* was a case of this sort. All parties (including the State of Arkansas) stipulated that approximately 6 percent of the plaintiff's settlement represented payment for medical costs. 547 U. S., at 274. In other cases a settlement may not be reached and the judge or jury, in its findings, may make an allocation. With a stipulation or judgment under this procedure, the anti-lien provision protects from state demand the portion of a beneficiary's tort recovery that the stipulation or judgment does not attribute to medical expenses.

North Carolina's statute, however, operates to allow the State to take one-third of the total recovery, even if a

proper stipulation or judgment attributes a smaller per-
centage to medical expenses. Consider the facts of *Ahl-
born*. There, only $35,581.47 of the beneficiary's settle-
ment "constituted reimbursement for medical payments
made." *Ibid.* North Carolina's statute, had it been applied
in *Ahlborn*, would have allowed the State to claim
$183,333.33 (one-third of the beneficiary's $550,000 set-
tlement). A conflict thus exists between North Carolina's
law and the Medicaid anti-lien provision.

The instant case, to be sure, is not quite so clear cut; for
there was no allocation of the settlement by either judi-
cial decree or binding stipulation of the parties. But the
reasoning of *Ahlborn* and the design of the federal statute
contemplate that possibility. When the State and the
beneficiary are unable to agree on an allocation, *Ahlborn*
noted, the parties could "submi[t] the matter to a court for
decision." *Id.,* at 288.

The facts of the present case demonstrate why *Ahlborn*
anticipated that a judicial or administrative proceeding
would be necessary in that situation. Of the damages
stemming from the injuries E. M. A. suffered at birth, it is
apparent that a quite substantial share must be allocated
to the skilled home care she will require for the rest of
her life. See App. 112. It also may be necessary to consider
how much E. M. A. and her parents could have expected to
receive as compensation for their other tort claims had the
suit proceeded to trial. An irrebuttable, one-size-fits-all
statutory presumption is incompatible with the Medicaid
Act's clear mandate that a State may not demand any por-
tion of a beneficiary's tort recovery except the share that
is attributable to medical expenses.

## B

North Carolina offers responses to this reasoning, but
none is persuasive.

First, the State asserts that it is doing nothing more

than what *Ahlborn* said it could do: "adop[t] special rules and procedures for allocating tort settlements." 547 U. S., at 288, n. 18. This misreads *Ahlborn*. There the Court, citing an *amicus* brief, referred to judicial proceedings some States had established for allocating tort settlements where necessary for insurance or tax purposes. See Brief for Association of Trial Lawyers of America, O. T. 2005, No. 04–1506, pp. 20–21 (citing *Henning* v. *Wineman*, 306 N. W. 2d 550 (Minn. 1981), and *Rimes* v. *State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 316 N. W. 2d 348 (1982)). Those examples illustrated the kind of "special rules and procedures for allocating tort settlements" that *Ahlborn* considered. The decision did not endorse irrebuttable presumptions that designate some arbitrary fraction of a tort judgment to medical expenses in all cases.

Second, North Carolina contends that its law falls within the scope of a State's traditional authority to regulate tort actions, including the amount of damages that a party may recover. This argument begins from a correct premise: In our federal system, there is no question that States possess the "traditional authority to provide tort remedies to their citizens" as they see fit. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984). But North Carolina's law is not an exercise of the State's general authority to regulate its tort system. It does not limit tort plaintiffs' ability to recover for certain types of nonmedical damages, and it does not say that medical damages are to be privileged above other damages in tort suits. All it seeks to do is to allocate the share of damages attributable to medical expenses in tort suits brought by Medicaid beneficiaries. A statute that singles out Medicaid beneficiaries in this manner cannot avoid compliance with the federal anti-lien provision merely by relying upon a connection to an area of traditional state regulation.

Third, North Carolina suggests that even though its allocation of one-third of a tort recovery to medical ex-

penses may be arbitrary, other methods for allocating a recovery would be just as arbitrary. In the State's view there is no "ascertainable 'true value' of [a] case that should control what portion of any settlement is subject to the State's third-party recovery rights." Brief for Petitioner 26–27. As explained earlier, allocations, while to some extent perhaps not precise, need not be arbitrary. See *supra,* at 9–10. In some cases a judgment or stipulation binding on all parties will allocate the plaintiff's recovery across different claims. Where no such judgment or stipulation exists, a fair allocation of such a settlement may be difficult to determine. Trial judges and trial lawyers, however, can find objective benchmarks to make projections of the damages the plaintiff likely could have proved had the case gone to trial.

In the instant case, for example, the North Carolina trial court approved the settlement only after finding that it constituted "fair and just compensation" to E. M. A. and her parents for her "severe and debilitating injuries"; for "medical and life care expenses" her condition will require; and for "severe emotional distress" from her injuries. App. 82. What portion of this lump-sum settlement constitutes "fair and just compensation" for each individual claim will depend both on how likely E. M. A. and her parents would have been to prevail on the claims at trial and how much they reasonably could have expected to receive on each claim if successful, in view of damages awarded in comparable tort cases.

This relates to North Carolina's fourth argument: that it would be "wasteful, time consuming, and costly" to hold "frequent mini-trials" in order to divide a settlement between medical and nonmedical expenses. Brief for Petitioner 28. Even if that were true, it would not relieve the State of its obligation to comply with the terms of the Medicaid anti-lien provision. And it is not true as a general proposition. States have considerable latitude to

design administrative and judicial procedures to ensure a prompt and fair allocation of damages. Sixteen States and the District of Columbia provide for hearings of this sort, and there is no indication that they have proved burdensome. Brief for United States as *Amicus Curiae* 28–29, and n. 7. See, *e.g.,* Cal. Welf. & Inst. Code Ann. §14124.76(a) (West 2011); Mo. Rev. Stat. §§208.215.9–11 (2012); Tenn. Code Ann. §§71–5–117(g)–(i) (2012); *In re E. B.*, 229 W. Va. 435, \_\_\_, 729 S. E. 2d 270, 297 (2012). Many of these States have established rebuttable presumptions and adjusted burdens of proof to ensure that speculative assessments of a plaintiff's likely recovery do not defeat the State's right to recover medical costs, a concern North Carolina raises. See, *e.g.,* Haw. Rev. Stat. §346–37(h) (2011 Cum. Supp.) (rebuttable presumption of a one-third allocation); Mass. Gen. Laws, ch. 118E, §22(c) (West 2010) (rebuttable presumption of full reimbursement); Okla. Stat., Tit. 63, §5051.1(D)(1)(d) (West 2011) (rebuttable presumption of full reimbursement, "unless a more limited allocation of damages to medical expenses is shown by clear and convincing evidence"). Without holding that these rules are necessarily compliant with the federal statute, it can be concluded that they are more accurate than the procedure North Carolina has enacted.

The task of dividing a tort settlement is a familiar one. In a variety of settings, state and federal courts are called upon to separate lump-sum settlements or jury awards into categories to satisfy different claims to a portion of the moneys recovered. See *supra,* at 11. See also, *e.g., Green* v. *Commissioner*, 507 F. 3d 857, 867–868 (CA5 2007) (separation of compensatory from noncompensatory damages for tax purposes); *Donnel* v. *United States*, 50 Fed. Cl. 375, 386–387 (2001) (separation of employee severance bonus from other payments for tax purposes); *In re Harrison*, 306 B. R. 172, 182–183 (Bkrtcy. Ct. ED Tex. 2003) (separation of pain-and-suffering damages from

other damages for purposes of bankruptcy exemption);
*Colorado Compensation Ins. Auth.* v. *Jones*, 131 P. 3d
1074, 1077–1078 (Colo. App. 2005) (separation of economic
from noneconomic damages for purposes of insurance sub-
rogation); *Spangler* v. *North Star Drilling Co.*, 552 So.
2d 673, 685 (La. App. 1989) (separation of past dam-
ages from future damages for purposes of calculating pre-
judgment interest).  Indeed, North Carolina itself uses a
judicial allocation procedure to ascertain the portion of a
settlement subject to subrogation in a workers' compensa-
tion suit.  It instructs trial courts to

> "consider the anticipated amount of prospective com-
> pensation the employer or workers' compensation car-
> rier is likely to pay to the employee in the future, the
> net recovery to plaintiff, the likelihood of the plaintiff
> prevailing at trial or on appeal, the need for finality in
> the litigation, and any other factors the court deems
> just and reasonable."   N. C. Gen. Stat. Ann. §97–
> 10.2(j) (Lexis 2011).

North Carolina would be on sounder footing had it adopted
a similar procedure for allocating Medicaid beneficiaries'
tort recoveries.  It might also consider a different one
along the lines of what other States have done in Medicaid
reimbursement cases.

   The State thus has ample means available to allocate
Medicaid beneficiaries' tort recoveries in an efficient man-
ner that complies with federal law.  Indeed, if States are
concerned that case-by-case judicial allocations will prove
unwieldy, they may even be able to adopt *ex ante* adminis-
trative criteria for allocating medical and nonmedical
expenses, provided that these criteria are backed by evi-
dence suggesting that they are likely to yield reasonable
results in the mine run of cases.  What they cannot do is
what North Carolina did here: adopt an arbitrary, one-
size-fits-all allocation for all cases.

Fifth, and finally, North Carolina contends that in two documents—a July 2006 memorandum and a December 2009 letter responding to an inquiry from a member of North Carolina's congressional delegation—the federal Centers for Medicare and Medicaid Services approved of North Carolina's statutory scheme for Medicaid reimbursement. In the State's view, these agency pronouncements are entitled to deference. See Brief for Petitioner 33–36 (citing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984)).

The 2006 and 2009 documents, however, no longer reflect the agency's position. See Brief for United States as *Amicus Curiae* 8–34. And at any rate, the documents are opinion letters, not regulations with the force of law. We have held that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen* v. *Harris County*, 529 U. S. 576, 587 (2000). These documents are "'entitled to respect'" in proportion to their "'power to persuade.'" *Ibid.* (quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)). Insofar as the 2006 and 2009 documents approve of North Carolina's statute, they lack persuasive force for the reasons discussed above.

\*          \*          \*

The law here at issue, N. C. Gen. Stat. Ann. §108A–57, reflects North Carolina's effort to comply with federal law and secure reimbursement from third-party tortfeasors for medical expenses paid on behalf of the State's Medicaid beneficiaries. In some circumstances, however, the statute would permit the State to take a portion of a Medicaid beneficiary's tort judgment or settlement not "designated as payments for medical care." *Ahlborn*, 547 U. S., at 284. The Medicaid anti-lien provision, 42 U. S. C. §1396p(a)(1),

bars that result.

The judgment of the Court of Appeals for the Fourth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–98

ALDONA WOS, SECRETARY, NORTH CAROLINA
DEPARTMENT OF HEALTH AND HUMAN SER-
VICES, PETITIONER *v.* E. M. A., A MINOR, BY
AND THROUGH HER GUARDIAN AD LITEM,
DANIEL H. JOHNSON, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2013]

JUSTICE BREYER, concurring.

I join the Court's opinion with one qualification: My concurrence in the Court's views rests in part upon the fact that the federal agency that administers the Medicaid statute, known as the Centers for Medicare & Medicaid Services, has reached the same conclusion.

The question before us is how to measure what share of a judgment or settlement of an accident victim's lawsuit represents payment (or reimbursement) for health care items (or services) for which a State has already paid on behalf of the victim. The statute is silent on the question. It simply says that a State may recover the amount of "payment" that the State has made on behalf of the victim "for medical assistance for health care items or services" from funds that "any other party" has paid "for such health care items or services." 42 U. S. C. §1396a(a)(25)(H). Moreover, the question focuses upon a comparatively minor matter of statutory detail, not a major issue of far-reaching statutory policy. It concerns everyday administration. It calls for expertise of a kind that the administering agency is more likely than a court to possess. And any of several different answers to the

question would seem reasonable. Under these circum-
stances, normally we should find that Congress delegated
to the agency authority to fill the statutory gap, and we
should uphold the agency's conclusion as long as it is
reasonable. See *Chevron U. S. A. Inc.* v. *Natural Re-
sources Defense Council, Inc.*, 467 U. S. 837, 844 (1984).

Here, however, the agency did not engage in rulemaking
procedures, it did not carefully consider differing points of
view of those affected, it did not set forth its views in a
manual intended for widespread use, nor has it in any
other way announced an interpretation that Congress
would have "intended . . . to carry the force of law." *United
States* v. *Mead Corp.*, 533 U. S. 218, 221 (2001). Indeed,
the agency does not claim that it exercised any dele-
gated legislative power.

Neither do the documents in which the agency set forth
its position (a memorandum and a letter) have much
"'power to persuade.'" *Christensen* v. *Harris County*, 529
U. S. 576, 587 (2000) (quoting *Skidmore* v. *Swift & Co.*,
323 U. S. 134, 140 (1944)). Their reasoning is skimpy.
And the conclusion now advanced by the agency repre-
sents a radical departure from the agency's previous posi-
tion. See App. to Pet. for Cert. 129a, 141a–142a. Thus,
the Solicitor General does not ask us to defer to the agen-
cy's views—and understandably so.

Nonetheless, the Administrative Procedure Act is not
the tax code. And cases that seek to determine whether
Congress intended courts to give weight to agency views
provide rules of thumb, general principles meant to guide
interpretation, not rigid rules that narrowly confine it.
They seek to advance Congress' intent as embodied in
particular statutory schemes by helping courts to deter-
mine whether, and how, Congress intended those courts to
respect an agency's expertise when reasonably exercised
in particular cases. They seek to allocate the law-
interpreting function between court and agency in a way

likely to work best within any particular statutory
scheme. But they do not purport to do more than that. In
particular, they do not set forth all-encompassing absolute
rules, impervious to nuance and admitting of no excep-
tions. Felix Frankfurter's observation, made many years
ago, remains valid today: "The problems subsumed by . . .
'administrative discretion' . . . must be related to . . . the
particular interest . . . as to which 'administrative discre-
tion' is exercised." The Task of Administrative Law, 75
U. Pa. L. Rev. 614, 619–620 (1927). That is to say, "the
standard doctrines of administrative law . . . should not
be taken too rigidly." Jaffe, Administrative Law: Burden
of Proof and Scope of Review, 79 Harv. L. Rev. 914, 918
(1966).

Thus, even though this case does not fall directly within
a case-defined category, such as "*Chevron* deference,"
"*Skidmore* deference," "*Beth Israel* deference," "*Seminole
Rock* deference," or deference as defined by some other
case, I believe the agency, in taking a position, nonethe-
less retains some small but special "power to persuade."
*Skidmore*, *supra*, at 140. See generally Eskridge & Baer,
The Continuum of Deference: Supreme Court Treatment
of Agency Statutory Interpretations from *Chevron* to *Ham-
dan*, 96 Geo. L. J. 1083 (2008). And I would conse-
quently to some degree take account of, and respect, the
agency's judgment.

I cannot measure the degree of deference with the preci-
sion of a mariner measuring a degree of latitude. But it
is still worth noting that the agency's determination has
played some role in my own decision. That is because the
agency, after looking into the matter more thoroughly
(perhaps after notice-and-comment rulemaking), might
change its mind. Given the nature of the question and
of the agency's expertise, courts, I believe, should then
give weight to that new and different agency decision. Cf.
*National Cable & Telecommunications Assn.* v. *Brand X*

*Internet Services*, 545 U. S. 967, 980–986 (2005). In my view, today's decision does not freeze the Court's present interpretation of the statute permanently into law.

With that understanding, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–98

———————

## ALDONA WOS, SECRETARY, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SER- VICES, PETITIONER *v.* E. M. A., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, DANIEL H. JOHNSON, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 20, 2013]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The State of North Carolina paid for E. M. A.'s medical expenses under its Medicaid plan. E. M. A. sued those al- leged to have caused her injuries, eventually settling for an amount that included, among other things, medical expenses already covered by North Carolina. The federal Medicaid statute requires North Carolina to recoup those expenses. But neither the Act nor the regulations issued under it tell States how to determine what portion of a third-party recovery should be attributed to medical ex- penses. The Court concludes that North Carolina's law addressing that question is nonetheless preempted by the Act.

The Court's reading of the Act, while plausible, is not compelled by the statutory text or our precedent. It has the unfortunate consequence of denying flexibility to the States—and, by necessary implication, the Secretary of Health and Human Services—in resolving a policy ques- tion with broad significance for this complicated program. In short, the result is both unnecessary and unwise. I therefore respectfully dissent.

## I

Medicaid is a cooperative federal-state program designed to provide medical assistance to certain needy populations. The basic idea is simple: The statute—as interpreted by the Secretary of HHS—sets out the requirements for an eligible Medicaid program. If States decide to enroll and comply with those requirements, they get federal money. If they don't, they don't. The federal contribution is not enough to fully fund any State's program; States contribute anywhere from 17 to 50 percent of the costs. See 42 U. S. C. §1396d(b) (2006 ed., Supp. V). The States have considerable discretion in structuring and administering their programs, subject of course to federal law and regulations.

In practice, it's not always so simple. The books are thick with federal regulations that States must interpret and reconcile. By my count, at least 39 federal-court opinions, including one of our own, have reiterated Judge Friendly's observation that Medicaid law is "almost unintelligible to the uninitiated." See *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 43 (1981) (quoting *Friedman* v. *Berger*, 547 F. 2d 724, 727, n. 7 (CA2 1976)); see also 453 U. S., at 43, n. 14 (quoting the District Court's description of Medicaid in *Friedman* as "an aggravated assault on the English language, resistant to attempts to understand it"). "Perhaps appreciating the complexity of what it had wrought, Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act." *Schweiker, supra,* at 43. But where the law and the Secretary are silent on a specific question, it is up to the States—sometimes informally advised by the federal Centers for Medicare and Medicaid Services—to make sense of it all in running their programs.

The relevant provisions here require that North Carolina (1) pay for certain people's medical care, (2) make

reasonable efforts to recoup from liable third parties (such as tortfeasors and insurers) any medical expenses it paid, and (3) not recoup such payments by imposing a lien on the beneficiary's property. See *ante*, at 4–5; see also 42 U. S. C. §1396a(a)(25)(B) (2006 ed.). To comply, North Carolina pays for a beneficiary's medical expenses on the condition that any such expenses the beneficiary recovers from third parties will go towards repaying the State. See N. C. Gen. Stat. Ann. §108A–59(a) (Lexis 2011).

The difficulty, however, is that tort victims seldom seek only medical expenses. Take this case: E. M. A. and her parents sought damages not only for medical expenses, but for lost income, pain and suffering, and other things, and ended up settling all these claims for a lump sum of $2.8 million. Such a situation poses the question of how much North Carolina can recoup—indeed, under federal law, *must* recoup—from a lump sum that reflects more than just medical expenses.

This puts North Carolina in a tight spot. If it fails to recover what it must, it violates federal law. If it takes a beneficiary's property beyond medical expenses, it violates federal law. Trying to navigate between these competing requirements—with no interpretive guidance from the Secretary of HHS—North Carolina elected to resolve the problem by laying out ground rules in advance, conditioning a beneficiary's right to recover from third parties on the beneficiary's willingness to fully repay the State, or, at a minimum, define one-third of her damages as "medical expenses," whichever is less. N. C. Gen. Stat. Ann. §§108A–59(a); 108A–57(a); see also *Andrews* v. *Haygood*, 362 N. C. 599, 603–604, 669 S. E. 2d 310, 313–314 (2008).

## II

The Court states that "[t]he problem" with North Carolina's designation—actual expenses or one-third of the recovery, whichever is less—"is not that it is an unreason-

able approximation in all cases," and acknowledges that
"[i]n some cases, it may well be a fair estimate." *Ante*,
at 9. According to the Court, however, because North
Carolina's law provides no "mechanism for determining
whether it is a reasonable approximation in any *particular*
case," *ibid.,* (emphasis added), it "directly conflict[s]" with
the "clear mandate" of the federal Medicaid statute, and is
therefore preempted. *Ante,* at 7 (quoting *PLIVA, Inc.* v.
*Mensing*, 564 U. S. __, __ (2011) (slip op., at 11) (internal
quotation marks omitted)), 10. This reflects a basic policy
judgment: that segregating medical expenses from a lump-
sum recovery must be done on a case-specific, after-the-
fact basis, rather than pursuant to a general rule spelled
out in advance.

The problem is that the Court can point to no statutory
or regulatory requirement, much less an unambiguous
one, requiring such an approach. The federal statute,
which provides that States must recoup medical expenses
owed by third parties, and which prevents States from
placing a lien on a beneficiary's property, says nothing
about how to comply with these two requirements in the
event of a settlement. See *ante,* at 1 (BREYER, J., concur-
ring) ("The statute is silent on the question").

Nor does our case law. As the Court acknowledges, our
decision in *Arkansas Dept. of Health and Human Servs.* v.
*Ahlborn*, was an easy one. 547 U. S. 268 (2006). There,
the underlying tort suit settled for $550,000, and the
Medicaid beneficiary and the State of Arkansas stipulated
that only $35,581.47 of the settlement represented medi-
cal expenses. The State nonetheless claimed it "was enti-
tled to a lien in the amount of $215,645.30"—*i.e.,* the total
amount paid by the State for the beneficiary's health care.
*Id.*, at 274. The question was whether the State could
demand this money in light of its stipulation that only
$35,581.47 reflected medical expenses. The answer, of
course, was no. The State is only entitled to recover medi-

cal expenses; nothing else. So when Arkansas contended that it was entitled to money the beneficiary had received for something other than medical expenses, we had no trouble rejecting that argument. That proposition—that States may not take money that is unrelated to medical expenses—does not help answer the question here: May a State condition Medicaid benefits on a beneficiary agreeing to define one-third of a tort recovery as reflecting "medical expenses"?

The Court recognizes that *Ahlborn* "had no occasion to resolve" the question "how to determine what portion of a settlement represents payment for medical care," *ante,* at 5, but then promptly proceeds as if *Ahlborn* had done just that. The Court quotes *Ahlborn* for the proposition that a State may not claim any portion of a tort recovery "not 'designated as payments for medical care,'" and then faults North Carolina's law because it "sets forth no process for determining what portion" is "attributable to medical expenses." *Ante,* at 6, 7 (quoting 547 U. S., at 284), 7. *Ahlborn* spoke of "designated" amounts because, as noted, there was a stipulated designation in that case. What to do when there is no such stipulation—when it's not clear "what portion of a settlement represents payment for medical care"—is a different question. The Court assumes the answer must be the same: that the settlement must be parsed in every case, so that there is an actual, after-the-fact designation in every case. If the parties do not agree on one, as they did in *Ahlborn*, there must be a process in place for reaching a case-specific attribution.

The nature of the "process" contemplated by the majority is unclear, but it must involve an effort to determine what claims would have succeeded had there been a trial, what the damages would have been for the separate claims, and so on—the very sort of inquiries settlement is intended to obviate. The Court talks of addressing these

concerns through "rebuttable presumptions and adjusted burdens of proof to ensure that speculative assessments of a plaintiff's likely recovery do not defeat the State's right to recover medical costs," but ominously declines to give any assurance "that these rules are necessarily compliant with the federal statute." *Ante*, at 13.

Nothing in *Ahlborn* requires all this, and North Carolina has taken a different approach. It has adjusted its tort law to account for its obligations under federal Medicaid law by requiring that beneficiaries pay the State back in full or designate one-third of any recovery as "medical expenses," whichever is less. This approach allows beneficiaries to obtain settlements, "meet[s] concerns about settlement manipulation," *Ahlborn, supra,* at 288, n. 18, complies with the statutory obligation that States make reasonable efforts to recover medical expenses from liable third parties, and guarantees that the beneficiary will never have to give back more than she has already received from the State.

There's nothing unusual about such an approach. States define the contours of their own tort law all the time, setting rules about who may recover in particular circumstances, what claims may be alleged, which parties are liable, what defenses may be asserted, what damages are recoverable, and so on. Doing so does not amount to imposing a lien on any property to which an individual has a vested right under state tort law. The Court says North Carolina cannot rely on its "traditional authority to regulate tort actions" because its rule in this case is not an exercise of its "general authority." *Ante*, at 11. The Court cites no support for this vague new limitation on a State's power to define tort remedies under state law, and I am aware of none.

In fact, federal law says nothing about how States must define the recovery available to a Medicaid beneficiary suing a third party. That silence is a good indication that

Congress did not mean to strip States of their traditional authority to regulate torts. See *Wyeth* v. *Levine*, 555 U. S. 555, 565 (2009) ("[I]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (internal quotation marks and ellipses omitted)). The closest the Medicaid Act gets to this topic is its requirement that States have "in effect laws under which . . . the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services." See 42 U. S. C. §1396(a)(25)(H). That Congress has said nothing else about what recovery a State must allow, though clearly aware of the traditional power of States to regulate recoveries under private law, should be worth something. Cf. *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 166–167 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them" (internal quotation marks omitted)).

The majority nonetheless dismisses North Carolina's solution as an arbitrary "one-size-fits-all" approach, *ante*, at 10, that has no "logical" endpoint; one that, if accepted, could permit States to "designate half, three-quarters, or all of a tort recovery in the same way." *Ante*, at 8, 9. This is an age-old objection to any line-drawing, to which Justice Holmes provided a familiar response: "Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." *Irwin* v. *Gavit*, 268 U. S. 161, 168 (1925). Whatever the case "as a doctrinal matter," it is *in fact* "easier to

defend North Carolina's" one-third designation than the Court's hypothetical where a State allocates all of a recovery to medical expenses. *Ante*, at 9. In addition, the majority's hobgoblin is less frightening when we remember that North Carolina never takes back more than what it paid for such expenses.

The reasons for drawing a bright line, as North Carolina has, are obvious and familiar. See generally Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989). Bright lines provide clear notice; here that means beneficiaries know exactly where they stand with respect to reimbursing the State as they negotiate settlements with third parties. Such clear rules are easy, cheap, and administrable—laudable qualities in the context of a vast and intricate program. The Court's approach, on the other end, requires the time of lawyers and judges, and that time costs money—money better spent on providing health care to the needy. Or so the State, responsible for administering its program, could conclude, and nothing in the statute, regulations, or our precedent says otherwise.

The majority points out that nearly one-third of the States conduct hearings of the sort it contemplates. *Ante,* at 13. Good for them. The whole point of our federal system is that different States may reach different judgments about how to run their own different programs. Such flexibility is particularly important in this context, where Medicaid spending is the largest component of most state budgets. The Court also notes that, in other areas, courts have undertaken the work of "separat[ing] lump-sum settlements or jury awards into categories to satisfy different claims." *Ibid.* My point is not that the work required by the Court cannot be done—just that it has not been required by Congress or the Secretary.

On that note, it's bad enough that the Court finds the State's reasonable effort to reconcile its competing obligations preempted. What is doubly unfortunate is that the

Court's analysis necessarily implies that the Secretary's hands are also tied. The Medicaid Act is Spending Clause legislation, and such legislation is binding on States only insofar as it is "unambiguous." See *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). In addition, the anti-lien provision only precludes North Carolina's law if, as the Court acknowledges, there is a "direct conflict" between the two. *Ante,* at 7 (quoting *PLIVA, Inc.*, 564 U. S., at \_\_\_ (slip op., at 11) (internal quotation marks omitted). The Court says—wrongly, I believe—that there is. *Ante*, at 10 ("An irrebuttable, one-size-fits-all statutory presumption is incompatible with the Medicaid Act's *clear mandate* that a State may not demand any portion of a beneficiary's tort recovery except the share that is attributable to medical expenses" (emphasis added)). But if North Carolina's approach directly conflicts with an unambiguous, clear mandate in the Act—such that any presumption against preemption is overcome, see *Wyeth, supra,* at 565, n. 3—it's hard to see how the Secretary could adopt a similar approach. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

The concurrence wishes this were not so, see *ante*, at 4 ("today's decision does not freeze the Court's present interpretation of the statute permanently into law"), but fails to acknowledge the express rationale of the Court's opinion. There is no other way to read the majority opinion than as foreclosing what the concurrence would like to leave open.

Or is there? In exactly two sentences, the Court seems to falter and lose the courage of its conviction that a State must have a process in place for an individual allocation of medical expenses in every case. The Court views the

problem with North Carolina's law as being that "the State provides no evidence to substantiate its claim that the one-third allocation is reasonable in the mine run of cases." *Ante*, at 9. That thought does not resurface until five pages later—and only then—when the Court says that States "may even be able to adopt *ex ante* administrative criteria for allocating medical and nonmedical expenses, provided these criteria are backed by evidence suggesting that they are likely to yield reasonable results in the mine run of cases." *Ante*, at 14.

I am not sure whether this is a concession that individualized hearings may not be required after all, but if it is, it is flatly contrary to the rest of the opinion. It is also quite odd to suggest that the problem with North Carolina's law would go away if only the State provided some sort of study substantiating the idea that one-third was a good approximation in most cases. North Carolina is not a federal agency, whose actions are subject to review under the Administrative Procedure Act's "substantial evidence" test. See 5 U. S. C. §706(2)(E). We have never before, in a preemption case, put the burden on the State to compile an evidentiary record supporting its legislative determination. The burden is, of course, on those challenging the law. See *Pharmaceutical Research and Mfrs. of America* v. *Walsh*, 538 U. S. 644, 661–662 (2003) (plurality opinion) ("We start . . . with a presumption that the state statute is valid, and ask whether petitioner has shouldered the burden of overcoming that presumption" (citation omitted)). We have said that, as a general matter, "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 213 (1997) (internal quotation marks omitted). Sovereign States should be accorded no less deference.

Keep in mind that the basis for all this is a federal law

that prohibits liens for medical assistance, but says *nothing* about how medical and nonmedical expenses are to be allocated. It is hard enough to figure out what the Medicaid Act means by what it *says*; we should not read so much into its silence.

Ultimately, it is a basic policy judgment whether the Medicaid program is best served in this instance by post hoc individualized determinations, or whether the issue may be addressed in advance, through a general rule, as North Carolina has done here. See *ante*, at 1–2 (BREYER, J., concurring) ("any of several different answers to the question would seem reasonable"). The Court can point to nothing that delegates to it the prerogative to make that judgment. Rather, States and the Secretary—working together—should be afforded the leeway to make their joint venture a workable one.

Because North Carolina's law does not conflict with federal law, I would let it be. I respectfully dissent.