*630 Justice Kennedy
delivered the opinion of the Court.
A federal statute prohibits States from attaching a lien on the property of a Medicaid beneficiary to recover benefits paid by the State on the beneficiary’s behalf. 42 U. S. C. § 1396p(a)(l). The anti-lien provision pre-empts a State’s effort to take any portion of a Medicaid beneficiary’s tort judgment or settlement not “designated as payments for medical care.” Arkansas Dept. of Health and Human Servs. v. Ahlborn, 547 U. S. 268, 284 (2006). North Carolina has enacted a statute requiring that up to one-third of any damages recovered by a beneficiary for a tortious injury be paid to the State to reimburse it for payments it made for medical treatment on account of the injury. See N. C. Gen. Stat. Ann. § 108A-57 (Lexis 2011); Andrews v. Haygood, 362 N. C. 599, 604-605, 669 S. E. 2d 310, 314 (2008). The question presented is whether the North Carolina statute is compatible with the federal anti-lien provision.
f—4
When respondent E. M. A. was born in February 2000, she suffered multiple serious birth injuries which left her deaf, blind, and unable to sit, walk, crawl, or talk. The injuries also cause her to suffer from mental retardation and a seizure disorder. She requires between 12 and 18 hours of skilled nursing care per day. She will not be able to work, live independently, or provide for her basic needs. The cost *631 of her ongoing medical care is paid in part by the State of North Carolina’s Medicaid program.
In February 2003, E. M. A. and her parents filed a medical malpractice suit in North Carolina state court against the physician who delivered E. M. A. at birth and the hospital where she was born. The expert witnesses for E. M. A. and her parents in that proceeding estimated damages in excess of $42 million for medical and life-care expenses, loss of future earning capacity, and other assorted expenses such as architectural renovations to their home and specialized transportation equipment. App. 91-112. By far the largest part of this estimate was for “Skilled Home Care,” totaling more than $37 million over E. M. A.’s lifetime. Id., at 112. E. M. A. and her parents also sought damages for her pain and suffering and for her parents’ emotional distress. Id., at 64-65, 67-68, 72-73, 75-76. Their experts did not estimate the damages in these last two categories.
Assisted by a mediator, the parties began settlement negotiations. E. M. A. and her parents informed the North Carolina Department of Health and Human Services of the negotiations. The department had a statutory right to intervene in the malpractice suit and participate in the settlement negotiations in order to obtain reimbursement for the medical expenses it paid on E. M. A.’s behalf, up to one-third of the total recovery. See N. C. Gen. Stat. Ann. §§ 108A-57, 108A-59. It elected not to do so, though its representative informed E. M. A. and her parents that the State’s Medicaid program had expended $1.9 million for E. M. A.’s medical care, which it would seek to recover from any tort judgment or settlement.
In November 2006, the court approved a $2.8 million settlement. The amount, apparently, was dictated in large part by the policy limits on the defendants’ medical malpractice insurance coverage. See Brief for Respondents 5. The settlement agreement did not allocate the money among the different claims E. M. A. and her parents had advanced. In *632 approving the settlement the court placed one-third of the $2.8 million recovery into an interest-bearing escrow account “until such time as the actual amount of the lien owed by [E. M. A.] to [the State] is conclusively judicially determined.” App. 87.
E. M. A. and her parents then filed this action under Rev. Stat. § 1979, 42 U. S. C. § 1983, in the United States District Court for the Western District of North Carolina. They sought declaratory and injunctive relief, arguing that the State’s reimbursement scheme violated the Medicaid anti-lien provision, § 1396p(a)(l). While that litigation was pending, the North Carolina Supreme Court confronted the same question in Andrews, supra. It held that the irrebuttable statutory presumption that one-third of a Medicaid beneficiary’s tort recovery is attributable to medical expenses was “a reasonable method for determining the State’s medical reimbursements.” Id., at 604, 669 S. E. 2d, at 314. The United States District Court, in the instant case, agreed. Armstrong v. Cansler, 722 F. Supp. 2d 653 (2010).
The Court of Appeals for the Fourth Circuit vacated and remanded. E. M. A. v. Cansler, 674 F. 3d 290 (2012). It concluded that North Carolina’s statutory scheme could not be reconciled with “Ahlborn’s clear holding that the general anti-lien provision in federal Medicaid law prohibits a state from recovering any portion of a settlement or judgment not attributable to medical expenses.” Id., at 310. In some cases, the court reasoned, the actual portion of a beneficiary’s tort recovery representing payment for medical care would be less than one-third. North Carolina’s statutory presumption that one-third of a tort recovery is attributable to medical expenses therefore must be “subject to adversarial testing” in a judicial or administrative proceeding. Id., at 311.
To resolve the conflict between the opinion of the Court of Appeals in this case and the decision of the North Carolina Supreme Court in Andrews, this Court granted certiorari. 567 U. S. 968 (2012).
*633 t—( K-i
At issue is the interaction between certain provisions of the federal Medicaid statute and state law. Congress has directed States, in administering their Medicaid programs, to seek reimbursement for medical expenses incurred on behalf of beneficiaries who later recover from third-party tort-feasors. States must require beneficiaries “to assign the State any rights ... to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from any third party.” 42 U. S. C. § 1396k(a)(l)(A). States receiving Medicaid funds must also
“ha[ve] in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services.” § 1396a(a)(25)(H).
A separate provision of the Medicaid statute, however, exists in some tension with these requirements. It says that, with exceptions not relevant here, “[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan.” § 1396p(a)(l).
In Ahlborn, the Court addressed this tension and held that the Medicaid statute sets both a floor and a ceiling on a State’s potential share of a beneficiary’s tort recovery. Federal law requires an assignment to the State of “the right to recover that portion of a settlement that represents payments for medical care,” but it also “precludes attachment or encumbrance of the remainder of the settlement.” 547 U. S., at 282, 284. This is so because the beneficiary has a property right in the proceeds of the settlement, bringing it within the ambit of the anti-lien provision. Id., at 285. *634 That property right is subject to the specific statutory “exception” requiring a State to seek reimbursement for medical expenses paid on the beneficiary’s behalf, but the anti-lien provision protects the beneficiary’s interest in the remainder of the settlement. Id., at 284.
A question the Court had no occasion to resolve in Ahl-bom is how to determine what portion of a settlement represents payment for medical care. The parties in that case stipulated that about 6 percent of respondent Ahlborn’s tort recovery (approximately $35,600 of a $550,000 settlement) represented compensation for medical care. Id., at 274. The Court nonetheless anticipated the concern that some settlements would not include an itemized allocation. It also recognized the possibility that Medicaid beneficiaries and tortfeasors might collaborate to allocate an artificially low portion of a settlement to medical expenses. The Court noted that these problems could “be avoided either by obtaining the State’s advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision.” Id., at 288.
North Carolina has attempted a different approach. Its statute provides:
“Notwithstanding any other provisions of the law, to the extent of payments under this Part, the State, or the county providing medical assistance benefits, shall be subrogated to all rights of recovery, contractual or otherwise, of the beneficiary of this assistance .... The county attorney, or an attorney retained by the county or the State or both, or an attorney retained by the beneficiary of the assistance if this attorney has actual notice of payments made under this Part shall enforce this section. Any attorney retained by the beneficiary of the assistance shall, out of the proceeds obtained on behalf of the beneficiary by settlement with, judgment against, or otherwise from a third party by reason of injury or death, distribute to the Department the *635 amount of assistance paid by the Department on behalf of or to the beneficiary, as prorated with the claims of all others having medical subrogation rights or medical liens against the amount received or recovered, but the amount paid to the Department shall not exceed one-third of the gross amount obtained or recovered.” N. C. Gen. Stat. Ann. § 108A-57(a).
Before Ahlborn was decided, North Carolina and the state courts interpreted this statute to allow the State to “recover the costs of medical treatment provided . . . even when the funds received by the [beneficiary] are not reimbursement for medical expenses.” Campbell v. North Carolina Dept. of Human Resources, 153 N. C. App. 305, 307-308, 569 S. E. 2d 670, 672 (2002). See also Ezell v. Grace Hospital, Inc., 360 N. C. 529, 631 S. E. 2d 131 (2006) (per curiam). Under Ahlborn, however, this construction of the statute is at odds with the Medicaid anti-lien provision, which “precludes attachment or encumbrance” of any portion of a settlement not “designated as payments for medical care.” 547 U. S., at 284.
In response to Ahlborn, the State advanced—and the North Carolina Supreme Court in Andrews accepted—a new interpretation of its statute. Under this interpretation the statute “defines ‘the portion of the settlement that represents payment for medical expenses’ as the lesser of the State’s past medical expenditures or one-third of the plaintiff’s total recovery.” Andrews, 362 N. C., at 604, 669 S. E. 2d, at 314. In other words, when the State’s Medicaid expenditures on behalf of a beneficiary exceed one-third of the beneficiary’s tort recovery, the statute establishes a conclusive presumption that one-third of the recovery represents compensation for medical expenses. Under this reading of the statute the presumption operates even if the settlement or a jury verdict expressly allocates a lower percentage of the judgment to medical expenses. See Tr. of Oral Arg. 10, 16-17. Cf. Andrews, supra, at 602-604, 669 S. E. 2d, at 313.
*636 ⅜—Í I—(
A
Under the Supremacy Clause, “[w]here state and federal law ‘directly conflict,’ state law must give way.” PLIVA, Inc. v. Mensing, 564 U. S. 604, 617 (2011). The Medicaid anti-lien provision prohibits a State from making a claim to any part of a Medicaid beneficiary’s tort recovery not “designated as payments for medical care.” Ahlborn, supra, at 284. North Carolina’s statute, therefore, is pre-empted if, and insofar as, it would operate that way.
And it is pre-empted for that reason. The defect in § 108A-57 is that it sets forth no process for determining what portion of a beneficiary’s tort recovery is attributable to medical expenses. Instead, North Carolina has picked an arbitrary number—one-third—and by statutory command labeled that portion of a beneficiary’s tort recovery as representing payment for medical care. Pre-emption is not a matter of semantics. A State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute’s intended operation and effect.
A similar issue was presented last Term, in National Meat Assn. v. Harris, 565 U. S. 452 (2012). That case involved the pre-emptive scope of the Federal Meat Inspection Act, 21 U. S. C. § 601 et seq. The Act prohibited States from imposing “ ‘[r]equirements . . . with respect to premises, facilities and operations’” at federally regulated slaughterhouses. National Meat Assn., 565 U. S., at 458 (quoting § 678). The State of California had enacted a law that prohibited slaughterhouses from (among other things) selling meat from non-ambulatory animals for human consumption. Id., at 458-459 (citing Cal. Penal Code Ann. § 599f(b) (West 2010)). California sought to defend the law on the ground that it did not regulate the activities of slaughterhouses but instead restricted *637 what type of meat could be sold in the marketplace after the animals had been butchered. 565 U. S., at 463.
The Court rejected that argument. It recognized that if the argument were to prevail, “then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the [Act’s] preemption provision.” Id., at 464. In a preemption case, the Court held, a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it.
That reasoning controls here. North Carolina’s argument, if accepted, would frustrate the Medicaid anti-lien provision in the context of tort recoveries. The argument lacks any limiting principle: If a State arbitrarily may designate one-third of any recovery as payment for medical expenses, there is no logical reason why it could not designate half, three-quarters, or all of a tort recovery in the same way. In Ahlborn, the State of Arkansas, under this rationale, would have succeeded in claiming the full amount it sought from the beneficiary had it been more creative and less candid in describing the effect of its full-reimbursement law.
Here the State concedes that it would be “difficult ... to defend” a law purporting to allocate most or all of a beneficiary’s tort recovery to medical expenses. Tr. of Oral Arg. 20. That is true; but, as a doctrinal matter, it is no easier to defend North Carolina’s across-the-board allocation of one-third of all beneficiaries’ tort recoveries to medical expenses. The problem is not that it is an unreasonable approximation in all cases. In some cases, it may well be a fair estimate. But the State provides no evidence to substantiate its claim that the one-third allocation is reasonable in the mine run of cases. Nor does the law provide a mechanism for determining whether it is a reasonable approximation in any particular case.
*638 In some instances, no estimate will be necessary or appropriate. When there has been a judicial finding or approval of an allocation between medical and nonmedical damages— in the form of either a jury verdict, court decree, or stipulation binding on all parties—that is the end of the matter. Ahlborn was a case of this sort. All parties (including the State of Arkansas) stipulated that approximately 6 percent of the plaintiff’s settlement represented payment for medical costs. 547 U. S., at 274. In other cases a settlement may not be reached and the judge or jury, in its findings, may make an allocation. With a stipulation or judgment under this procedure, the anti-lien provision protects from state demand the portion of a beneficiary’s tort recovery that the stipulation or judgment does not attribute to medical expenses.
North Carolina’s statute, however, operates to allow the State to take one-third of the total recovery, even if a proper stipulation or judgment attributes a smaller percentage to medical expenses. Consider the facts of Ahlborn. There, only $35,581.47 of the beneficiary’s settlement “constituted reimbursement for medical payments made.” Ibid. North Carolina’s statute, had it been applied in Ahlborn, would have allowed the State to claim $183,333.33 (one-third of the beneficiary’s $550,000 settlement). A conflict thus exists between North Carolina’s law and the Medicaid anti-lien provision.
The instant case, to be sure, is not quite so clear cut; for there was no allocation of the settlement by either judicial decree or binding stipulation of the parties. But the reasoning of Ahlborn and the design of the federal statute contemplate that possibility. When the State and the beneficiary are unable to agree on an allocation, Ahlborn noted, the parties could “submi[t] the matter to a court for decision.” Id., at 288.
The facts of the present case demonstrate why Ahlborn anticipated that a judicial or administrative proceeding *639 would be necessary in that situation. Of the damages stemming from the injuries E. M. A. suffered at birth, it is apparent that a quite substantial share must be allocated to the skilled home care she will require for the rest of her life. See App. 112. It also may be necessary to consider how much E. M. A. and her parents could have expected to receive as compensation for their other tort claims had the suit proceeded to trial. An irrebuttable, one-size-fits-all statutory presumption is incompatible with the Medicaid Act’s clear mandate that a State may not demand any portion of a beneficiary’s tort recovery except the share that is attributable to medical expenses.
B
North Carolina offers responses to this reasoning, but none is persuasive.
First, the State asserts that it is doing nothing more than what Ahlborn said it could do: “adop[t] special rules and procedures for allocating tort settlements.” 547 U. S., at 288, n. 18. This misreads Ahlborn. There the Court, citing an amicus brief, referred to judicial proceedings some States had established for allocating tort settlements where necessary for insurance or tax purposes. See Brief for Association of Trial Lawyers of America, O. T. 2005, No. 04-1506, pp. 20-21 (citing Henning v. Wineman, 306 N. W. 2d 550 (Minn. 1981), and Rimes v. State Farm Mut. Auto. Ins. Co., 106 Wis. 2d 263, 316 N. W. 2d 348 (1982)). Those examples illustrated the kind of “special rules and procedures for allocating tort settlements” that Ahlborn considered. The decision did not endorse irrebuttable presumptions that designate some arbitrary fraction of a tort judgment to medical expenses in all cases.
Second, North Carolina contends that its law falls within the scope of a State’s traditional authority to regulate tort actions, including the amount of damages that a party may recover. This argument begins from a correct premise: In our federal system, there is no question that States possess *640 the “traditional authority to provide tort remedies to their citizens” as they see fit. Silkwood v. Kerr-McGee Corp., 464 U. S. 238, 248 (1984). But North Carolina’s law is not an exercise of the State’s general authority to regulate its tort system. It does not limit tort plaintiffs’ ability to recover for certain types of nonmedical damages, and it does not say that medical damages are to be privileged above other damages in tort suits. All it seeks to do is to allocate the share of damages attributable to medical expenses in tort suits, brought by Medicaid beneficiaries. A statute that singles out Medicaid beneficiaries in this manner cannot avoid compliance with the federal anti-lien provision merely by relying upon a connection to an area of traditional state regulation.
Third, North Carolina suggests that even though its allocation of one-third of a tort recovery to medical expenses may be arbitrary, other methods for allocating a recovery would be just as arbitrary. In the State’s view there is no “ascertainable ‘true value’ of [a] case that should control what portion of any settlement is subject to the State’s third-party recovery rights.” Brief for Petitioner 26-27. As explained earlier, allocations, while to some extent perhaps not precise, need not be arbitrary. See supra, at 638. In some cases a judgment or stipulation binding on all parties will allocate the plaintiff’s recovery across different claims. Where no such judgment or stipulation exists, a fair allocation of such a settlement may be difficult to determine. Trial judges and trial lawyers, however, can find objective benchmarks to make projections of the damages the plaintiff likely could have proved had the case gone to trial.
In the instant case, for example, the North Carolina trial court approved the settlement only after finding that it constituted “fair and just compensation” to E. M. A. and her parents for her “severe and debilitating injuries”; for “medical and life care expenses” her condition will require; and for “severe emotional distress” from her injuries. App. 82. What portion of this lump-sum settlement constitutes “fair *641 and just compensation” for each individual claim will depend both on how likely E. M. A. and her parents would have been to prevail on the claims at trial and how much they reasonably could have expected to receive on each claim if successful, in view of damages awarded in comparable tort cases.
This relates to North Carolina’s fourth argument: that it would be “wasteful, time consuming, and costly” to hold “frequent mini-trials” in order to divide a settlement between medical and nonmedical expenses. Brief for Petitioner 28. Even if that were true, it would not relieve the State of its obligation to comply with the terms of the Medicaid anti-lien provision. And it is not true as a general proposition. States have considerable latitude to design administrative and judicial procedures to ensure a prompt and fair allocation of damages. Sixteen States and the District of Columbia provide for hearings of this sort, and there is no indication that they have proved burdensome. Brief for United States as Amicus Curiae 28-29, and n. 7. See, e. g., Cal. Welf. & Inst. Code Ann. § 14124.76(a) (West 2011); Mo. Rev. Stat. §§208.215.9-11 (2012); Tenn. Code Ann. §§71-5-117(g)-(i) (2012); In re E. B., 229 W. Va. 435, 462, 729 S. E. 2d 270, 297 (2012). Many of these States have established rebuttable presumptions and adjusted burdens of proof to ensure that speculative assessments of a plaintiff’s likely recovery do not defeat the State’s right to recover medical costs, a concern North Carolina raises. See, e. g., Haw. Rev. Stat. § 346-37(h) (2011 Cum. Supp.) (rebuttable presumption of a one-third allocation); Mass. Gen. Laws, ch. 118E, § 22(e) (West 2010) (re-buttable presumption of full reimbursement); Okla. Stat., Tit. 63, § 5051.1(D)(1)(d) (West 2011) (rebuttable presumption of full reimbursement, “unless a more limited allocation of damages to medical expenses is shown by clear and convincing evidence”). Without holding that these rules are necessarily compliant with the federal statute, it can be concluded that they are more accurate than the procedure North Carolina has enacted.
*642 The task of dividing a tort settlement is a familiar one. In a variety of settings, state and federal courts are called upon to separate lump-sum settlements or jury awards into categories to satisfy different claims to a portion of the moneys recovered. See supra, at 640. See also, e. g., Green v. Commissioner, 507 F. 3d 857, 867-868 (CA5 2007) (separation of compensatory from noncompensatory damages for tax purposes); Donnel v. United States, 50 Fed. Cl. 375, 386-387 (2001) (separation of employee severance bonus from other payments for tax purposes); In re Harrington, 306 B. R. 172, 182-183 (Bkrtcy. Ct. ED Tex. 2003) (separation of pain-and-suffering damages from other damages for purposes of bankruptcy exemption); Colorado Compensation Ins. Auth. v. Jones, 131 P. 3d 1074, 1077-1078 (Colo. App. 2005) (separation of economic from noneconomic damages for purposes of insurance subrogation); Spangler v. North Star Drilling Co., 552 So. 2d 673, 685 (La. App. 1989) (separation of past damages from future damages for purposes of calculating prejudgment interest). Indeed, North Carolina itself uses a judicial allocation procedure to ascertain the portion of a settlement subject to subrogation in a workers’ compensation suit. It instructs trial courts to
“consider the anticipated amount of prospective compensation the employer or workers’ compensation carrier is likely to pay to the employee in the future, the net recovery to plaintiff, the likelihood of the plaintiff prevailing at trial or on appeal, the need for finality in the litigation, and any other factors the court deems just and reasonable.” N. C. Gen. Stat. Ann. §97-10.2(j) (Lexis 2011).
North Carolina would be on sounder footing had it adopted a similar procedure for allocating Medicaid beneficiaries’ tort recoveries. It might also consider a different one along the lines of what other States have done in Medicaid reimbursement cases.
*643 The State thus has ample means available to allocate Medicaid beneficiaries’ tort recoveries in an efficient manner that complies with federal law. Indeed, if States are concerned that .case-by-case judicial allocations will prove unwieldy, they may even be able to adopt éx ante administrative criteria for allocating medical and nonmedical expenses, provided that these criteria are backed by evidence suggesting that they are likely to yield reasonable results in the mine run of cases. What they cannot do is what North Carolina did here: adopt an arbitrary, one-size-fits-all allocation for all cases.
Fifth, and finally, North Carolina contends that in two documents—a July 2006 memorandum and a December 2009 letter responding to an inquiry from a member of North Carolina’s congressional delegation—the federal Centers for Medicare & Medicaid Services approved of North Carolina’s statutory scheme for Medicaid reimbursement. In the State’s view, these agency pronouncements are entitled to deference. See Brief for Petitioner 33-36 (citing Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984)).
The 2006 and 2009 documents, however, no longer reflect the agency’s position. See Brief for United States as Ami-cus Curiae 8-34. And at any rate, the documents are opinion letters, not regulations with the force of law. We have held that “[interpretations such as those in opinion letters— like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.” Christensen v. Harris County, 529 U. S. 576, 587 (2000). These documents are “‘entitled to respect’” in proportion to their “ ‘power to persuade.’ ” Ibid. (quoting Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944)). Insofar as the 2006 and 2009 documents approve of North Carolina’s statute, they lack persuasive force for the reasons discussed above.
* * *
*644 The law here at issue, N. C. Gen. Stat. Ann. § 108A-57, reflects North Carolina’s effort to comply with federal law and secure reimbursement from third-party tortfeasors for medical expenses paid on behalf of the State’s Medicaid beneficiaries. In some circumstances, however, the statute would permit the State to take a portion of a Medicaid beneficiary’s tort judgment or settlement not “designated as payments for medical care.” Ahlborn, 547 U. S., at 284. The Medicaid anti-lien provision, 42 U. S. C. § 1396p(a)(l), bars that result.
The judgment of the Court of Appeals for the Fourth Circuit is affirmed.

It is so ordered.