PRESENT: Goodwyn, C.J., Mims, Powell, Kelsey, McCullough, and Chafin, JJ., and Koontz, S.J.

AMIR FARAH

v. Record No. 201413

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
FEBRUARY 17, 2022

COMMONWEALTH OF VIRGINIA,
DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Brett A. Kassabian, Judge

Amir Farah suffered catastrophic injuries in a car accident. The Commonwealth's Medicaid program paid for a portion of his extensive subsequent medical care. This entitles the Commonwealth to a lien on the proceeds of a verdict or settlement of claims arising out of the accident, but only on that portion of the recovery that represents his Medicaid-funded care. Farah sued the driver who caused the accident and the case settled. The Circuit Court of Fairfax County then conducted a hearing to determine what portion of the settlement is subject to the Medicaid lien. Disappointed with the result the circuit court reached, Farah appeals. For the reasons noted below, we conclude that Virginia's apportionment statute does not conflict with precedent from the United States Supreme Court, and, further, that the factual findings of the circuit court must be sustained under the applicable deferential standard of review. Accordingly, we will affirm the judgment below.

BACKGROUND

Farah, who worked as a cab driver, was gravely injured in a head-on crash. The driver who caused the collision was in the wrong lane of travel. Farah received Medicaid benefits following the crash. Farah sued the driver of the vehicle that struck him. His complaint sought $3 million in compensatory damages and $350,000 in punitive damages. The parties ultimately

settled the dispute for $375,000 (the policy limits of insurance coverage plus a $25,000 personal contribution from the driver).

The Virginia Department of Medical Assistance Services ("DMAS") asserted a lien in the amount of $96,481.40 against the settlement proceeds for medical services provided to Farah. App. 189, Joint Stipulations § B,1.[1]  The parties were unable to agree on the amount of a reduction for the Medicaid lien.  Farah filed a motion to apportion his settlement under Code § 8.01-66.9.  He requested a hearing to apportion the Medicaid lien, and the court granted him one over the Commonwealth's objection.  Prior to the hearing, Farah and DMAS agreed to certain stipulations of fact.

The stipulations detail the extensive injuries Farah suffered in the accident, including fractures of the skull, face, leg, and foot bones, as well as knocked out front teeth.  He underwent over 20 surgeries and was in the intensive care unit ("ICU") for over a month, followed by a period of rehabilitation.  While in the ICU, Farah's jaw was wired shut and he was fed through a feeding tube in his stomach.  He sustained cosmetic disfigurement from the injuries to his nose and his knocked out front teeth, which have not been corrected, and he has scars from his surgery on his legs and neck.  The stipulations provide that "[t]he retail price of Mr. Farah's claimed medical expenses from the 6/17/2018 crash total[s] $591,483.71."  Farah still owes over $62,000 in medical bills not reimbursed by DMAS.

At the apportionment hearing, Farah testified about the injuries he incurred, as well as the suffering he endured during his recovery and that he continues to endure, both psychological and physical.  He can no longer work or care for himself.  He is able to move around with the aid of a

---

[1] The Commonwealth did not claim that its lien extended to future medical payments. Therefore, *Gallardo v. Marstiller*, No. 20-1263, which deals with this question and which is currently pending before the United States Supreme Court, has no bearing on the present case.

cane, but his strength and mobility are severely limited. An orthopedic surgeon testified about Farah's permanent injuries to his face, mouth, neck, teeth, left arm, left hand, hips, knees, ankles and feet.

The stipulations and evidence from the hearing also address Farah's lost earnings. He was almost 35 years old at the time of the accident. He has not worked since the accident. Farah earned approximately $27,000 per year as a cab driver and his expected work-life at the time of the crash totaled approximately 32.25 years. At the hearing, a rehabilitation counselor opined that the nature of Farah's injuries, and his background as an immigrant with limited education, likely precluded Farah from ever working again in any capacity. Farah estimated his lost wages over the course of his lifetime at $832,000.

Brien Roche, an experienced personal injury attorney, offered testimony at the hearing concerning his assessment of the value of Farah's case. He testified that a conservative valuation of Farah's case is $4 million. He based his assessment on a review of the file, including medical reports, reports concerning Farah's lost earnings, his inability to gain employment, and other documentation.

Following the hearing, the circuit court explained that it was unpersuaded by Farah's argument that certain cases from the United States Supreme Court compelled the use of a specific formula. The court acknowledged "the nature of this horrific accident and the substantial and permanent injuries sustained by this Plaintiff who by all accounts was innocent of any wrongdoing which contributed to this accident." The court reviewed in detail Farah's injuries, his pain and suffering, and his inability to work. The circuit court apportioned the $375,000 settlement as follows:

    $ 85,500 to DMAS for its reduced lien;
    $ 100,000 to Farah's counsel for attorney's fees;

3

$ 15,807 to Farah's counsel for costs advanced;
$ 173,693 to Farah.

Under the circuit court's ruling, the Medicaid lien represents approximately 23 percent of the settlement.

Farah appeals from this decision.

ANALYSIS

Medicaid is a federal-state program that provides medical assistance to residents of participating states who cannot afford medical care. *See* 42 U.S.C. § 1396a(a). Federal law requires States to include a provision in their Medicaid plans for recouping from liable third parties funds spent on behalf of Medicaid recipients. 42 U.S.C. § 1396a(a)(25)(A). States must take all reasonable measures to find third parties that are liable for the coverage of a Medicaid recipient's medical costs. *Id.* States must also include a provision that requires Medicaid participants to sign over their rights to seek and collect payment for medical care from a liable third party to the State. 42 U.S.C. § 1396a(a)(25)(H). States are required to seek reimbursement from the third party if legal liability is found, unless the cost of pursuing the reimbursement outweighs the amount of reimbursement. 42 U.S.C. § 1396a(a)(25)(B); *see also* 42 U.S.C. § 1396p(a).

Another provision, 42 U.S.C. § 1396p(a)(1), known as the "anti-lien" provision, limits a State's ability to recover the full value of their lien in certain circumstances. This statute specifies that "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan." *Id.*

The third-party liability requirements can operate in tension with the anti-lien strictures when a Medicaid recipient receives a tort recovery that is insufficient to both cover Medicaid's expenditures and to fully compensate the recipient for his or her other damages. In a pair of

4

cases, the United States Supreme Court addressed the tension between these statutory commands. In *Arkansas Department of Health & Human Services v. Ahlborn*, 547 U.S. 268 (2006), the State claimed that it was entitled to "more than just that portion of a judgment or settlement that represents payment for medical expenses," i.e., that it was entitled to recover the entirety of its lien. *Id.* at 278. The plaintiff was a young woman who suffered debilitating injuries in a car crash. *Id.* at 268. The parties stipulated that the case was reasonably valued at approximately three million dollars. *Id.* at 274. The case settled for $550,000. The State had expended approximately $215,000 and it sought "to recover the entirety of the costs it paid on the Medicaid recipient's behalf." *Id.* at 278. The Supreme Court rejected that argument, concluding that the anti-lien provision limits the State to a recovery of "that portion of a settlement that represents payments for medical care." *Id*. at 282. The State could not satisfy its lien by encumbering the plaintiff's other recovered damages, such as lost wages or pain and suffering. In *Ahlborn*, given the stipulated reasonable value of the case, the proportional amount the State could recover was approximately $35,000. *Id.* at 288.

Later, in *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013), the Court examined whether a state could employ a lien allocation method that automatically attributed up to one-third of every judgment or settlement to its Medicaid lien. *Id.* at 630. The Court concluded that picking an arbitrary number, such as one third, was not a reasonable method of allocation. *Id*. at 636. The Court offered further guidance, noting that "[w]hen the State and the beneficiary are unable to agree on an allocation," the parties can "submit the matter to a court for decision." *Id.* at 638. The Court observed that "States have considerable latitude to design administrative and judicial procedures to ensure a prompt and fair allocation of damages." *Id.* at 641.

Virginia's apportionment statute is found in Code § 8.01-66.9. It provides in relevant part:

> The court in which a suit by an injured person or his personal representative has been filed against the person, firm or corporation alleged to have caused such injuries or in which such suit may properly be filed, may, upon motion or petition by the injured person, his personal representative or his attorney, and after written notice is given to all those holding liens attaching to the recovery, reduce the amount of the liens and apportion the recovery, whether by verdict or negotiated settlement, between the plaintiff, the plaintiff's attorney, and the Commonwealth or such Department or institution as the equities of the case may appear, provided that the injured person, his personal representative or attorney has made a good faith effort to negotiate a compromise pursuant to § 2.2-514. The court shall set forth the basis for any such reduction in a written order.[2]

I. VIRGINIA'S APPORTIONMENT STATUTE DOES NOT CONFLICT WITH PRECEDENT FROM THE UNITED STATES SUPREME COURT.

A. Supreme Court precedent does not require any particular formula.

Farah contends that case law from the United States Supreme Court requires a State to employ the following formula:

*[Total Settlement ÷ Full Value of Claim] x Medicaid Lien Amount].* Ap. Br. at 18.

We discern nothing in either *Wos* or *Ahlborn* that compels the use of such a formula. The Court itself expressly acknowledged that the decision in *Ahlborn* did not prescribe any particular method for apportionment of the Medicaid lien. *Wos*, 568 U.S. at 634 ("A question the Court had no occasion to resolve in *Ahlborn* is how to determine what portion of a settlement represents payment for medical care."). The Supreme Court made it clear that "States have

---

[2] The General Assembly has repeatedly considered amendments to this statute, but it has not enacted any of the proposed changes. *See* S.B. 159, Va. Gen. Assem. (Reg. Sess. 2018); S.B. 155, Va. Gen. Assem. (Reg. Sess. 2010).

6

considerable latitude" to develop their own procedures for allocating funds. *Id.* at 641; *see also id.* at 643 (noting that the States have "ample means available to allocate Medicaid beneficiaries' tort recoveries in an efficient manner that complies with federal law").[3]

      B.      The proportional amount of the State's Medicaid lien can be determined by stipulations or by the presentation of evidence.

It may be possible to determine the value of the Commonwealth's Medicaid lien by a stipulation of the portion of the settlement that constitutes compensation for medical care. To avoid a challenge by the State on the basis that such a stipulation shortchanges the State, a plaintiff may find it wise to obtain "the State's advance agreement to an allocation." *Ahlborn*, 547 U.S. at 288.[4] In the absence of such an agreement, it will be necessary to "submit[] the matter to a court for decision." *Id.* A hearing will not always be required. When the trial court has presided over a trial of the case, for example, a hearing will ordinarily not be required. Parties also may be able to reach stipulations that obviate the need for an evidentiary hearing.

Code § 8.01-66.9 broadly allows a trial court to reduce a Medicaid lien "as the equities of the case may appear." Although United States Supreme Court precedent does not compel the use of a particular formula, precedent from that Court does cabin a court's discretion under Code § 8.01-66.9. Courts are not free to simply choose a number that seems fair. Following *Ahlborn* and *Wos*, courts must, where appropriate, reduce the Medicaid lien to a value that reflects "that

---

[3] Other courts agree. *See Lathan v. Office of Recovery Servs.*, 448 P.3d 1241, 1248 (Utah 2019) ("The *Ahlborn* Court did not endorse any such formula."); *In re E.B.*, 729 S.E.2d 270, 296 (W. Va. 2012) ("There can be no question that the *Ahlborn* formula is not the only method of allocation to be followed. There is nothing in the *Ahlborn* decision that compels the use of the formula applied in that case.").

[4] The Supreme Court has recognized the possibility "that Medicaid beneficiaries and tortfeasors might collaborate to allocate an artificially low portion of a settlement to medical expenses," *Wos.*, 568 U.S. at 634, to manipulate the settlement in order to "allocate away the State's interest." *Ahlborn*, 547 U.S. at 288.

7

portion of a settlement that represents payments for medical care." *Ahlborn*, 547 U.S. at 282. The Supreme Court has construed the anti-lien provision to foreclose the State from claiming more than its proportional share of a verdict, judgment or settlement. *Id.* at 282, 284 (anti-lien provision "precludes attachment or encumbrance of the remainder of the settlement"). Code § 8.01-66.9 empowers trial courts to examine the potentially wide range of variables specific to each case in determining whether to reduce the Medicaid lien at all, and if so, by how much. Therefore, following *Ahlborn* and *Wos*, courts must examine the totality of a plaintiff's damages, such as lost wages, and damages for pain and suffering, disfigurement, deformity, humiliation, and embarrassment, and make a reasonable allocation for what portion of the verdict, judgment or settlement is attributable to medical expenses paid for by Medicaid.

C.    The Medicaid lien is based on amounts paid by the State's Medicaid program, not total medical expenses.

The parties disagree about whether a court tasked with apportioning a Medicaid lien should consider the entirety of the medical expenses or merely the portion of a Medicaid lien that the State has actually paid. Farah contends that the court should only look to the amount actually paid by the Medicaid program, whereas the Commonwealth argues that the court should consider total amounts billed (but not necessarily paid) by medical care providers. We agree with Farah.

First, we note that the Supreme Court's decisions in *Ahlborn* and *Wos* did not specifically address the issue of "[w]hether a Medicaid lien may be enforced against the portion of a tort settlement that represents medical expenses that are billed but not paid because medical providers have accepted discounted payments in full satisfaction of their bills." *See Southwest Fiduciary, Inc., v. Ariz. Health Care Cost Containment Sys. Admin.*, 249 P.3d 1104, 1107 (Ariz. Ct. App. 2011). We conclude that the allocation decision should be based on the amount Medicaid has actually paid, not on amounts of medical expenses billed but not paid. We base

8

this conclusion on the statutory text and the logic of Supreme Court precedent. First, under the Medicaid anti-lien provision, "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance *paid or to be paid* on his behalf under the State plan." 42 U.S.C. § 1396p(a)(1) (emphasis added). This provision contemplates a lien for medical assistance paid, not an artificial "list price" billed by a medical provider that was never, in fact, paid. Furthermore, when a benefit recipient makes an assignment to the State, 42 U.S.C. § 1396k(b) provides that "any amount collected by the State under [such] an assignment . . . shall be retained by the State . . . to reimburse it for [Medicaid] *payments made* on behalf of" the recipient, and "the remainder of such amount collected shall be paid" to the recipient. (Emphasis added). Again, the text of the statute contemplates a lien for amounts actually paid. Another part of this statute provides that,

> *to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished* to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services.

42 U.S.C. § 1396a(a)(25)(H) (emphasis added). "[S]uch health care items or services" is most naturally and reasonably read as referring to those "health care items or services" for which "payment has been made under the State plan." *Id.* Finally, the Virginia statute, Code § 8.01-66.9 provides a lien for "the total amount paid" – not abstract amounts billed but never actually paid. Therefore, we conclude that the relevant amount for purposes of allocating the Medicaid lien is the amount the State Medicaid program actually paid, not medical expenses billed by the provider but never paid by the State's Medicaid program.

Second, the thrust of the decisions in *Ahlborn* and *Wos* was to ensure the State could recoup a proportional share of the sums it expended on indigent medical care, but no more. The

9

Supreme Court stated in *Ahlborn* that "the exception carved out by §§ 1396a(a)(25) and 1396k(a) is limited to *payments* for medical care." 547 U.S. at 284-85 (emphasis added). The Supreme Court's decision in *Ahlborn* to limit the lien exception to that portion of a settlement allocated to medical *payments* supports our conclusion in these cases that the Medicaid lien does not extend beyond those amounts that are actually paid.

II. THE CIRCUIT COURT'S FACTUAL FINDINGS WERE NOT PLAINLY WRONG OR WITHOUT EVIDENCE TO SUPPORT THEM.

With these principles in mind, we now turn to the question of whether the circuit court's judgment should be sustained. The familiar standard of review guides our examination of the record. We accord "[g]reat deference" to a trial court's factual findings. *Jones v. Eley*, 256 Va. 198, 201 (1998). "[A]n appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." *Commonwealth v. Presley*, 256 Va. 465, 466 (1998). We will not set aside the factual findings of a trial court unless they are "plainly wrong or without evidence to support [them.]" Code § 8.01-680. *See, e.g.*, *Grayson v. Westwood Buildings L.P.*, 300 Va. 25, 58 (2021).

Allocating damages is no easy task, a fact the Supreme Court acknowledged. *Wos*, 568 U.S. at 640 (absent stipulation, a fair settlement allocation "may be difficult to determine"). Tort cases come in a wide range of guises, from a relatively simple "fender bender" to cases that are extremely complex, factually and legally. Parties commonly disagree over the extent of a plaintiff's pain and suffering, lost wages, the extent to which injuries are permanent, and so on.

In the present case, the circuit court heard extensive evidence concerning Farah's injuries. The record is clear that the court carefully considered this evidence. The court acknowledged the extensive nature of the plaintiff's medical bills, his pain and suffering, and his inability to work. As the finder of fact, the circuit court was entitled to discredit evidence that it found

10

unpersuasive. For example, Mr. Roche testified that the full value of the case was $4 million, but the ad damnum of the complaint asked for $3 million.

The circuit court did order a reduction of the State's lien. Following the reduction, the Medicaid lien constitutes approximately 23 percent of the settlement. Although we have the authority to reverse verdicts or judgments that are inadequate as a matter of law, *see, e.g., Bowers v. Sprouse*, 254 Va. 428 (1997),

> [t]he exercise of this power . . . is limited by the admonitory principle that, ordinarily, it is within the province of the jury to determine the amount of damages. In a personal injury case, where there is no legal measure of damages for physical pain and suffering, and the jury has arrived at a verdict based upon competent evidence and controlled by proper instructions, in an impartially conducted trial, it has always been held that their verdict is inviolate and cannot be disturbed by the court.

*Davenport v. Aldrich*, 207 Va. 271, 273-74 (1966). Here, the circuit court, acting as factfinder, benefits from comparable deference in making its factual findings to allocate damages under Code § 8.01-66.9. *See Commonwealth, Dep't of Med. Assistance Servs. v. Huynh*, 262 Va. 165, 172 (2001) (apportionment of medical and nonmedical damages is a matter of "sound judicial discretion"). The deferential standard leads us to affirm the circuit court's judgment.[5]

---

[5] In its ruling from the bench and in its final order, the circuit court did not specifically provide a breakdown of each discrete category of damages, such as pain and suffering or lost wages. In order to determine what portion of a plaintiff's settlement can properly be attributed to a Medicaid program's payments for medical care, a court must examine the plaintiff's total damages in order to make that allocation. We perceive nothing in the law of Virginia or in federal law, however, that requires a circuit court to go beyond a determination of the amount of the State's Medicaid lien and to specify from the bench, or in an order, a breakdown for each specific type of damages. The United States Supreme Court has not imposed such a requirement. The text of Code § 8.01-66.9 does not require it either. Although such specificity might be helpful, the court here provided figures for persons or entities that needed to be paid a portion of the settlement, such as DMAS and plaintiff's counsel. Nothing more was required.

CONCLUSION

The judgment of the circuit court will be affirmed.

*Affirmed.*